

# THE ATTORNEY GENERAL
# OF TEXAS

PRICE DANIEL
ATTORNEY GENERAL

AUSTIN, TEXAS

February 16, 1950

Hon. C. H. Cavness
State Auditor
Capitol Station
Austin, Texas

Opinion No. V-999

Re: Constitutionality of the grant
of public funds made by H.B.
No. 97, Acts 51st Leg., R.S.
1949, ch. 540, p. 1000, to soil
conservation districts created
under Article 165a-4, V.C.S.,
and the procedure prescribed
to withdraw same from the
State Treasury.

Dear Sir:

Your request for an opinion presents eleven questions pertaining to House Bill No. 97, Acts 51st Leg., R.S. 1949, ch. 540, p. 1000, the first three of which are as follows:

"1. Does the Legislature have constitutional authority to make a grant of this type to districts such as the State Soil Conservation Districts?

"2. Can the Comptroller issue a warrant payable to a Soil Conservation District on funds drawn from the General Revenue Fund, based only on the certification of the State Soil Conservation Board, which funds can be deposited in the local depository of the Soil Conservation District and become a checking account of such district?

"3. If your answer to the above question is No, can the Soil Conservation Districts present their vouchers to the Comptroller's Office for payment of such expenditures as are authorized by the provisions of H.B. 97, after an allotment has been approved by the State Soil Conservation Board for the particular district?"

We will first discuss the three questions above in the order stated.

Section 1 of H.B. 97, supra, reads as follows:

"Section 1. There is hereby appropriated out of the General Fund of the State Treasury not otherwise appropriated the sum of Two and One-Half Million Dollars ($2,500,000) for the fiscal year ending August 31, 1950,

and the sum of Two and One-Half Million Dollars ($2,500,000) for the fiscal year ending August 31, 1951, to the several soil conservation districts in Texas. A soil conservation district shall be eligible to receive grants for each period of the biennium after it has been duly organized and a Certificate of Organization for the district has been approved and signed by the Secretary of State. All grants to soil conservation districts shall be made by the State Soil Conservation Board based on the Board's determination of equity and need of the district applying for grant."

Before we can answer the first question, it is necessary to first consider and determine the nature or status of soil conservation districts and the purposes for which they were created.

The first two paragraphs of Section 59, Article XVI of the Constitution of Texas read as follows:

"Sec. 59 a. The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its over-flowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

"(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law."

This section of the Constitution authorizes the creation of various kinds of conservation and reclamation districts. Many of such districts have been created by the Legislature (See the respective Acts

following Art. 8197f, V.C.S.). Many others have been created under authority of statutes enacted by the Legislature pursuant to its mandatory provisions. (Title 128, chs. 2-8, and Art. 165a-4, V.C. S.); Hodge v. Lower Colorado River Authority, 163 S.W.2d 855 (Tex. Civ. App. 1942, error dism. by agr.).

Soil conservation districts are created under the provisions of Article 165a-4, V.C.S., a very long and comprehensive statute which was first enacted by Acts 46th Leg., 1939, ch. 3, p. 7, amended by Acts 47th Leg., 1941, ch. 308, p. 491, and is known as the "State Soil Conservation Law." Section 2 thereof reads as follows:

"Sec. 2. Legislative Determinations, and Declaration of Policy.

"It is hereby declared, as a matter of Legislative Determination:

"(a) The Condition. That the farm and grazing lands of the State of Texas are among the basic assets of the State and that the preservation of these lands is necessary to protect and promote the health, safety, and general welfare of its people; that improper land-use practices have caused and have contributed to, and are now causing and contributing to, a progressively more serious erosion of the farm and grazing lands of this State by wind and water; that the breaking of natural grass, plant, and forest cover has interfered with the natural factors of soil stabilization, causing loosening of soil and exhaustion of humus, and developing a soil condition that favors erosion; that the topsoil is being blown and washed out of fields and pastures; that there has been an accelerated washing of sloping fields; that these processes of erosion by wind and water speed up with removal of absorptive topsoil, causing exposure of less absorptive and less protective but more erosive subsoil; that failure by any occupier of land to conserve the soil and control erosion upon such land causes a washing and blowing of soil and water from such lands onto other lands and makes the conservation of soil and control of erosion on such other lands difficult or impossible.

"(b) The Consequences. That the consequences of such soil erosion in the form of soil-blowing and soil-washing are the silting and sedimentation of stream channels, reservoirs, dams, ditches, and harbors; the loss of fertile soil material in dust storms; the piling up of soil

on lower slopes, and its deposit over alluvial plains; the reduction in productivity or outright ruin of rich bottom lands by overwash of poor subsoil material, sand, and gravel swept out of the hills; deterioration of soil and its fertility, deterioration of crops grown thereon, and declining acre yields despite development of scientific processes for increasing such yields; loss of soil and water which causes destruction of food and cover for wildlife; a blowing and washing of soil into streams which silts over spawning beds, and destroys water plants, diminishing the food supply of fish; a diminishing of the underground water reserve, which causes water shortages, intensifies periods of drought, and causes crop failures; an increase in the speed and volume of rainfall run-off, causing severe and increasing floods, which bring suffering, disease, and death; impoverishment of families attempting to farm eroding and eroded lands; damage to roads, highways, railways, farm buildings, and other property from floods and from dust storms; and losses in navigation, hydro-electric power, municipal water supply, irrigation developments, farming, and grazing.

"(c) The Appropriate Corrective Methods. That to conserve soil resources and control and prevent soil erosion, it is necessary that land-use practices contributing to soil wastage and soil erosion may be discouraged and discontinued, and appropriate soil-conserving land-use practices be adopted and carried out; that among the procedures necessary for widespread adoption, are the carrying on of engineering operations such as the construction of terraces, terrace outlets, check dams, dikes, ponds, ditches, and the like; the utilization of strip cropping, lister furrowing, contour cultivating, and contour furrowing; land irrigation, seeding and planting of waste, sloping, abandoned, or eroded lands to water-conserving and erosion-preventing plants, trees, and grasses; forestation and reforestation; rotation of crops, soil stabilization with trees, grasses, legumes, and other thick-growing, soil-holding crops, retardation of runoff by increasing absorption of rainfall; and retirement from cultivation of steep, highly erosive areas and areas now badly gullied or otherwise eroded.

"(d) Declaration of Policy. It is hereby declared to be the policy of the Legislature to provide for the conservation of soil and soil resources of this State, and for the control and prevention of soil erosion, and thereby to preserve natural resources, control floods, prevent impairment of dams

and reservoirs, assist in maintaining the navigability of rivers and harbors, preserve wildlife, protect the tax base, protect public lands, and protect and promote the health, safety, and general welfare of the people of this State, and thus to carry out the mandate expressed in Article XVI , Section 59a, of the Constitution of Texas. It is further declared as a matter of Legislative intent and determination of policy that the agencies created, powers conferred and the activities contemplated in this Act for the conservation of soil and water resources and for the reduction of public damage resulting from failure to conserve such natural resources, shall be supplementary and complementary to the work of various river and other authorities now established in the State and to other State officers, agencies, and districts engaged in closely related projects, and shall not be duplicative thereof nor conflicting therewith."

Section 3 provides in part that:

"Sec. 3. Definitions.

"Wherever used or referred to in this Act, unless a different meaning clearly appears from the context:

"(1) 'District' or 'Soil Conservation District' means a governmental subdivision of this State, and a public body corporate and politic, organized in accordance with the provisions of this Act, for the purposes, with the powers, and subject to the restrictions hereinafter set forth.

". . . .

"(8) 'Agency of this State' includes the government of this State and any subdivision, agency, or instrumentality, corporate or otherwise, of the government of this State.

"(9) 'United States' or 'Agencies of the United States' includes the United States of America, the Soil Conservation Service of the United States Department of Agriculture, and any other agency or instrumentality, corporate or otherwise, of the United States of America.

"(10) 'Government' or 'Governmental' includes the Government of this State, the Government of the United States, and any subdivision, agency, or instrumentality, corporate or otherwise of either of them."

Hon. C. H. Cavness, page 6 (V-999)

Section 4 creates the State Soil Conservation Board, consisting of five members, "to serve as an agency of the State and to perform the functions conferred on it in this Act"; divides the State into five (5) districts for the purpose of selecting one member of the Board from each district; prescribes the procedure to be followed in selecting such members and filling vacancies on the Board; fixes their tenure of office and compensation; requires each member of the Board to "take the State Constitutional Oath of Office"; empowers the Board to employ an administrative officer and such other employees, determine their qualifications, duties and compensation, "according to the terms and amounts as specified in the general appropriation bills." Subsection G of this section reads:

"G. In addition to the duties and powers hereinafter conferred upon the State Soil Conservation Board, it shall have the following duties and powers:

"(1) To offer such assistance as may be appropriate to the supervisors of Soil Conservation Districts, organized as provided hereinafter, in the carrying out of any of the powers and programs.

"(2) To coordinate the programs of the several Soil Conservation Districts organized hereunder so far as this may be done by advice and consultation.

"(3) To secure the cooperation and assistance of the United States and any of its agencies, and of agencies of this State, in the work of such districts.

"(4) To disseminate information throughout the State concerning the activities and programs of the Soil Conservation Districts organized hereunder, and to encourage the formation of such districts in areas where their organization is desirable."

Other sections of the statute prescribe in detail, and at great length, the procedure to be followed by landowners and the State Soil Conservation Board in organizing a soil conservation district; the selecting of its governing body consisting of five members or supervisors; fixing their tenure of office and compensation; and defining their powers and duties, and the powers of the districts so created. Included in the powers granted and withheld from such districts in Section 7 are the following:

". . . .

"(8) To sue and be sued in the name of the district; to have a seal, which seal shall be judicially noticed; to

Hon. C. H. Cavness, page 7 (V-999)

have perpetual succession unless terminated as here-
inafter provided; to make and execute contracts and
other instruments, necessary or convenient to the ex-
ercise of its powers, to make, and from time to time
amend and repeal, rules and regulations not inconsistent
with this Act, to carry into effect its purposes and pow-
ers;

"(9) As a condition to the extending of any benefits
under this Act to, or the performance of work upon, any
lands not owned or controlled by this State or any of its
agencies, the supervisors may require contributions in
the form of services, materials, or otherwise to any op-
eration conferring such benefits, and may require land
occupiers to enter into and perform such agreements or
covenants as to the permanent use of such lands as will
tend to prevent or control erosion thereon.

"(10) The supervisors shall have no power to levy
taxes, and no debts incurred in the name of the district
shall create a lien on lands of landowners or land oc-
cupiers in the district."

The Courts of this State, so far as we have been able to
ascertain, have had no occasion to consider Article 165a-4 for any
purpose. However, our appellate courts have had before them the
question of the status or nature of conservation and reclamation dis-
tricts of different kinds created by the Legislature under authority of
Section 59, Article XVI of the Constitution, and of those districts
created under statutes enacted pursuant to the same authority.

In the case of State v. Smith, 47 S.W.2d 642 (Tex. Civ. App.
1932), the Court had before it the question of the constitutionality of
Articles 165a-165m, Vernon's Civil Statutes (Acts 42nd Leg., 2nd C.
S. 1931, ch. 2, p. 2), which purported to regulate the planting, growing
and harvesting of cotton and other soil exhausting plants for the pur-
pose of preserving and conserving the soil. The Act declared that:
"The preservation and restoration of the soil and the fertility of the
soil is essential to the welfare of the people of the State."

The Court held some regulatory provisions of the statute
contravened certain provisions of both the Federal and State Constitu-
tions. With these provisions we are not here concerned. In the course
of the opinion, the Court said:

"In 1917 our State Constitution was amended by
adding section 59 (a) to article 16, which authorizes the
Legislature to pass all laws that are appropriate for
the conservation and development of all of the natural

Hon. C. H. Cavness, page 8 (V-999)

resources of the state. Unquestionably, we think the soil is one of the natural resources of the state, and, if it becomes necessary, we think the Legislature could enact such reasonable and appropriate laws as may be required for the preservation of the soil. The question as to whether said laws were reasonable and appropriate would be for judicial determination."

In the case of Willacy County Water Control and Improvement Dist. No. 1 v. Abendroth, 142 Tex. 320, 177 S.W.2d 936 (1944), it became necessary for the court to determine the status or nature of a district created under the provisions of Section 59, Article XVI of the Constitution, and Title 128, Chapter 3A, Articles 7880-1 to 7880-147z, V.C.S. The Court said:

". . . . Irrigation districts, navigation districts, levee and improvement districts, and like political subdivisions created under Section 59a of Article XVI of the Constitution, and statutes enacted thereunder carrying out the purposes of such constitutional provision, are not classed with municipal corporations, but are held to be political subdivisions of the State, performing governmental functions, and standing upon the same footing as counties and other political subdivisions established by law. Harris County Flood Control District v. Mann, 135 Tex. 239, 140 S.W.2d 1098; Wharton County Drainage District No. 1 et al. v. Higbee et al., Tex. Civ. App., 149 S.W. 381, writ refused; Bexar-Medina-Atascosa Counties Water Improvement District No. 1 v. State, Tex. Civ. App., 21 S.W.2d 747, writ refused; Engleman Land Co. et al. v. Donna Irrigation District No. 1 et al., Tex. Civ. App., 209 S.W. 428, writ refused; Arneson v. Shary et al., Tex. Civ. App., 32 S.W.2d 907, appeal dismissed, Arneson v. United Irr. Co., 284 U.S. 592, 52 S.Ct. 202, 76 L.Ed. 510; Harris County Drainage District No. 12 v. City of Houston, Tex. Com. App., 35 S.W.2d 118, 120; 44 Tex. Jur., p. 262, § 176."

Counties are appropriate agencies through which the State may perform duties resting on the State. Weaver v. Scurry County, 28 S.W. 836 (Tex. Civ. App. 1894); Bexar County v. Linden, 110 Tex. 344, 220 S.W. 761 (1920); City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S.W. 818 (1923); Jefferson County v. Board of County and District Road Indebtedness, 143 Tex. 99, 182 S.W.2d 908 (1944).

Conservation districts created by the Legislature under the provisions of Section 59 are governmental agencies, bodies politic and corporate, and have been held to be competent agencies of the State

through which the State may perform certain governmental functions and duties. Brazos River Conservation and Reclamation District v. McCraw, 126 Tex. 506, 91 S.W.2d 665 (1936); Harris County Flood Control District v. Mann, 135 Tex. 239, 140 S.W.2d 1098 (1940).

In view of the provisions of Section 59 of Article XVI of the Constitution of Texas and Article 165a-4, and the status of other conservation districts created under similar statutes enacted under authority of Section 59, and the status of such districts created by the Legislature under the same authority, we think a soil conservation district created under the provisions of Article 165a-4 is a political subdivision of the State, a body politic and corporate, and a State governmental agency with authority to exercise such rights, privileges and functions pertaining to the conservation and reclamation of soil, a natural resource of the State, and the other purposes named in Section 2 thereof, as we have been conferred upon it by Section 59 and this Article. The Legislature has declared all these purposes are to "protect and promote the health, safety, and general welfare of the people of this State, and thus carry out the mandate expressed in Article XVI, Section 59, of the Constitution of Texas." (Art. 165a-4, sec. 2, subsec. (d) ).

Therefore, it is our opinion that soil conservation districts created under the provisions of Art. 165a-4 are proper agencies through which the State may perform duties resting upon the State.

Our Courts, in passing on the question of the constitutionality of an Act of the Legislature, have often said:

". . . every reasonable intendment and presumption will be made in favor of the constitutionality and validity of a statute, until the contrary is clearly shown. The Legislature is presumed to have regarded constitutional limitations or requirements in enacting laws, as assiduously as the courts do in construing and applying them. And before a legislative act will be set aside, it must clearly appear that its validity cannot be supported by any reasonable intendment or allowable presumption." 39 Tex. Jur. 251, Statutes, Sec. 133.

In the recent case of State v. Rector, 224 S.W.2d 706, (Tex. Sup. 1949) it was said:

"This Court has repeatedly held that no Act of the Legislature will be declared unconstitutional unless some provision of the Constitution can be cited which clearly shows that the Act is invalid. Texas National Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627; Harris County v. Stewart, 91 Tex. 133, 41 S.W. 650; Brown

v. City of Galveston, 97 Tex. 1, 75 S.W. 488; 9 Tex.
Jur., pp. 477, 478, § 59."

Therefore, it cannot be said that the Legislature lacked the power to make the appropriations found in House Bill 97 to the several soil conservation districts of this State, unless there is some provision in the constitution which can be cited clearly withholding such power from that body. The only provisions of the Constitution which may be considered as possibly inhibiting the Legislature from making these grants of public money to such districts are the following:

Section 3, Article VIII of the Constitution reads:

"Taxes shall be levied and collected by general laws and for public purposes only."

The pertinent provision of Section 48, Article III of the Constitution reads:

"Sec. 48. The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, . . . ."

Section 51, Article III of the Constitution reads in part as follows:

"Sec. 51. The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporations whatsoever, provided, however, . . . . the provisions of this section shall not be construed so as to prevent the grant of aid in cases of public calamity."

In numerous instances the courts of this and other jurisdictions, and text writers, have said that the question of what is a public purpose cannot be answered by any precise definition. 6 McQuillen on Municipal Corporations (2d Ed.) 338, Sec. 2532.

"What may or may not be termed a 'public purpose' is not easily defined, and no definition has as yet been framed that will fit all conditions or provisions, . . . The determination of whether a particular purpose is public or private is ultimately a judicial question, but the public policy of the state, as it has found expression in legislative enactments is entitled to weighty consideration, and all reasonable doubts on the question should be

resolved in favor of a legislative declaration thereon."
50 C.J. 860, Sec. 67.

In Green v. Frazier, 44 N.D. 395, 176 N.W. 11 (1920), affirmed, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1919), the term "public purpose" was defined as follows:

". . . . a public purpose . . . has for its objective the promotion of the general welfare of all the inhabitants or residents within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety, morals, general welfare, security, prosperity, contentment, and equality before the law of all the citizens of the state."

In affirming this case, the Supreme Court of the United States said:

". . . What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, § 176. 'Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people.' "

In Weaver v. Scurry County, 28 S.W. 836 (Tex. Civ. App. 1894), it was held that the determination of what is a public purpose is largely left to the legislature.

In Davis v. City of Taylor, 123 Tex. 39, 67 S.W.2d 1033 (1934), it was held that Section 3, Article VIII of the Constitution inhibited municipalities, including home rule cities, from imposing taxes for other than public purposes. The Court also held this section of the Constitution did not inhibit the City of Taylor, a home rule city, from adopting an amendment to its charter authorizing the city to assess and collect an ad valorem tax on property within the city to be devoted to "the growth, advertisement, development, improvement and increase of the tax values in the city," and for the establishment and maintenance of a Board of City Development with authority to expend funds so derived for such purposes. The Court said:

"It would not be of value now to attempt to
thoroughly define or discuss what are public pur-
poses. No exact definition can be made. Suffice it
to say that, unless a court can say that the purposes
for which public funds are expended are clearly not
public purposes, it would not be justified in holding
invalid, a legislative act or provision in a city charter
providing funds for such purposes." (Emphasis added)

In Friedman v. American Surety Co. of New York, 139 Tex.
570, 151 S.W.2d 570 (1941), the Court said, in substance, that the pur-
pose of Section 48, Article III of the Constitution is "to prohibit the
Legislature from levying taxes or imposing burdens for purposes
other than to administer the Government. . . . The administering of
the Government, however, covers and embraces a very large field
of action."

The Thirty-Sixth Legislature, at its third called session
passed an Act (Acts 36th Leg., 3rd C.S. 1920, ch. 22, p. 32), by which
the State donated and granted to the City of Aransas Pass, for a period
of 20 years, eight-ninths of the State ad valorem taxes to be collected
upon the property and from persons in San Patricio County; author-
ized the issuance of bonds by the city to procure money to be used ex-
clusively to construct and maintain sea walls, breakwaters, and shore
protection in order to avert from the city calamitous overflows; and
declared that the taxes donated to the city should be held in trust and
applied to create a sinking fund for the redemption of the bonds and
pay the interest thereon. Thereafter, bonds were duly authorized by
the resident tax paying voters of the city. When the bond record was
presented to the then Attorney General of Texas for approval, he raised
several constitutional objections to the Act and refused to approve the
record. Whereupon, the city instituted proceedings in the Supreme
Court to compel him to approve the bond record.

The Attorney General urged that the Act was unconstitutional
in that it violated several prohibitory provisions of the Constitution, one
of which was Section 51, Article III, denying power to the Legislature to
make any grant of public money to a municipal corporation. The Court
in City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S.W. 818 (1923), an-
swered this contention, saying:

"The act makes no grant of public money as for-
bidden by section 51 of article 3 of the Constitution. The
state here bestows no gratuity. The people of the state
at large have a direct and vital interest in protecting the
coast cities from the perils of violent storms. The de-
struction of ports, through which moves the commerce
of the state, is a state-wide calamity. Hence sea walls
and breakwaters on the Gulf coast, though of special

benefit to particular communities, must be regarded
as promoting the general welfare and prosperity of
the state. It is because of the special benefits to par-
ticular cities and counties that special burdens on
property within their boundaries, through taxation, are
justified. But the state, in promoting the welfare, ad-
vancement, and prosperity of all her citizens, or in
aiding to avert injury to her entire citizenship, cannot
be regarded otherwise than as performing a proper
function of state government. Cities or counties fur-
nish convenient and appropriate agencies through which
the state may perform duties resting on the state, in
the performance of which the cities or counties have a
special interest. The use of the cities or counties as
agents of the state in the discharge of the state's duty
is in no wise inhibited by the Constitution in section 51
of article 3. Bexar County v. Linden, 110 Tex. 344 to 348,
220 S.W. 761; City of Galveston v. Posnainsky, 62 Tex.
127, 50 Am. Rep. 517; Weaver v. Scurry County (Tex. Civ.
App.) 28 S.W. 836." (Emphasis added)

The Court concluded that the grant of the State's taxes to
the City of Aransas Pass to be used for the purposes stated in the Act
was expressly authorized by Section 8, Article XI of the Constitution.

In Bexar County v. Linden, 110 Tex. 344, 220 S.W. 761 (1920),
the Court had under consideration the constitutionality of a statute which
required a district attorney to pay over to the county fees collected by
him in excess of the amount which the statute permitted him to retain.
It appears that of the amount claimed by the county to be due it from
Mr. Linden the greater part thereof had been paid to him by the State
of Texas out of public funds in the State Treasury for his services
rendered as District Attorney.

It was the defendant's contention that the statute was uncon-
stitutional as amounting to a grant of public money to counties of the
State as municipal corporations, within the meaning of Section 51, Ar-
ticle III of the Constitution. The trial court and the Court of Civil Ap-
peals sustained the contention. The Supreme Court reversed and re-
manded, saying:

"The giving away of public money, its application to
other than strictly governmental purposes, is what the
provision is intended to guard against. The prohibition
is a positive and absolute one except as to a distinctive
class to whom the State is under a sacred obligation. Not
only are individuals, associations of individuals and pri-
vate corporations within its spirit, but all kinds of public
or political corporations, as well, whether strictly municipal

Hon. C. H. Cavness, page 14 (V-999)

or not. It therefore applies to counties, whether con-
sidered as public corporations or only quasi corpora-
tions. . . .

"If, therefore, the effect of the statute is to bestow
funds of the State upon counties of the State as a gratuity,
or for uses not related to the State's governmental duties,
it would be invalid. On the other hand, if its effect is to
but apply such funds to the uses of the State, as a gov-
ernment, there can be no reason for holding it void.

"It is accordingly important to consider the nature
of counties under our form of government, their relation-
ship to the State, their functions and their uses, in order
to ascertain whether the powers they exercise in a gov-
ernmental capacity are other than State powers, and
whether their use of such State funds as are constituted
by these excess fees for the purposes to which they may
legally apply them, is any other than a use for the State
as a government, for which purpose the counties are only
availed of as a means."

After discussing and defining the nature of counties, their
relationship to the State, and their functions, the Court continued:

"Since the duties which the counties perform are
State duties and the powers they exercise are State pow-
ers, an apportionment to them of State funds, as the pay-
ment into their treasuries of the excess fees of District
Attorneys under this statute, for the carrying out of those
duties, is manifestly not a grant of public money. There
is nothing of the bestowal of a bounty or gratuity about
it. It is but a method adopted by the State for the discharge
of an obligation of the State--the obligation to provide the
people with the facilities of civil government through the
counties as effective agencies for the purpose. The counties
receiving such excess fees can appropriate them to none
other than strictly governmental purposes, from which,
presumably, the State as a sovereignty, derives the bene-
fit."

The validity of certain Road Bond Assumption Acts of the
Legislature was upheld in Jefferson County v. Board of County and Road
District Indebtedness, supra. The Court, after quoting the prohibitory
provisions of Section 51, Article XXI, of the Constitution said at 182 S.
W.2d 912:

"This section of the Constitution forbids the granting
of public moneys to any 'municipal or other corporations

Hon. C. H. Cavness, page 15 (V-999)

whatsoever.'  Under the decisions of this State this
provision prohibits the granting of public moneys to
counties.  Bexar County v. Linden, 110 Tex. 339, 220
S.W. 761.  However, it does not prohibit every appro-
priation of State funds for use by counties.  It merely
prohibits the bestowing of gratuities on counties.
Counties are agencies of the State through which the
State performs a part of its governmental functions.
Consequently an apportionment of State funds to
counties to be used by them in carrying out a part of
the duties or governmental functions which properly
rest on the State is not a gratuity within the meaning
of the above constitutional inhibition.  Bexar County v.
Linden, supra; City of Arkansas Pass v. Keeling, 112
Tex. 339, 247 S.W. 818.  The construction of public
roads is a governmental function properly belonging
to the State.  Robbins v. Limestone County, 114 Tex.
345, 268 S.W. 915.  Consequently public funds may be
apportioned by the Legislature to counties for the pur-
pose of constructing public roads or for other govern-
mental purposes.  In doing so the State is merely using
the county as its agent to use its funds for the purpose
of performing its functions.  Bexar County v. Linde,
supra; City of Arkansas Pass v. Keeling, supra; Road
District No. 4, Shelby County v. Allred, 123 Tex. 77,
68 S.W.2d 164."  (Emphasis added)

In Brazos River Conservation and Reclamation District v.
McCraw, supra, the Court said at 91 S.W.2d 673:

"The Conservation Amendment to the Constitution
of the state (article 16, § 59 (a) expressly declares that
the performance of the duties prescribed for this dis-
trict are 'public rights and duties,' and the Legislature
is commanded to 'pass all such laws as may be appropriate
thereto.' . . . .

The purposes for which this District was created are enum-
erated in the Court's opinion, one of which is:

"For the purpose of conservation of all soils against
destructive erosion and thereby preventing the increased
flood menace incident thereto."

Soil conservation districts are to accomplish not only the
same purposes, but many others, including the restoration of the fer-
tility of soil.  An examination of numerous Acts of the Legislature cre-
ating conservation districts discloses that one of the purposes for which
such districts were created is to prevent soil erosion.  In many instances

the Legislature has donated all or part of the State's ad valorem taxes collected therein for general purposes during a given period. In many instances this period has been for more than two years on the basis of a finding of public calamity, but that question is not presented here because the appropriation in H.B. 97 is limited to the current biennium. See Opinion V-794, dated March 25, 1949.

We think the purposes for which soil conservation districts were created are for public purposes and are in the interest of and for the general welfare of all the people of the State. The functions of such districts are undoubtedly governmental functions. The Legislature has evidently considered such functions as duties resting upon the State, under both the provisions of Section 59, Article XVI of the Constitution and Article 165a-4, and that there is no provision of the Constitution inhibiting it from making grants of public money to such districts to enable them to perform such duties. Its acts over a long period of years lead to no other conclusion.

The original State Soil Conservation Law was enacted in 1939 and from that time down to and including the appropriations for the current biennium, the Legislature has consistently made appropriations to pay per diem and mileage of delegates selected to attend State District Conservation Conventions held for the purpose of selecting a member of the State Soil Conservation Board, and to pay the per diem of supervisors of soil conservation districts and five cents per mile traveled, as provided in Article 165a-4. Furthermore, the Legislature has in numerous instances granted, loaned, or both granted and loaned public money out of the State Treasury to Conservation districts. [1]

---

[1]  A loan of $5,000 was made to the Lower Colorado River Authority by the Act creating the District (Acts 43rd Leg., 4th C.S. 1934, ch. 7, p. 19); A grant of $10,000 to the same District (Acts 44th Leg., 1st C.S. 1935, ch. 405, p. 1604); A grant of $5,000 to the Sabine-Neches Conservation and Reclamation District by the Act creating the District (Acts 44th Leg., R.S. 1935, ch. 97, p. 237); Another grant to same District in the sum of $500 for "Expenses of District work" (Acts 45th Leg., R.S. 1937, ch. 384, p. 786); A further grant to this District in the sum of $6,000 was made in 1939 (Acts 46th Leg., R.S. 1929, ch. 30, p. 519); Lower Neches Valley Authority granted a loan of $10,000 (Acts 46th Leg., R.S. 1939, ch. 25, p. 503); Another loan of $10,000 was subsequently made to this District in 1941 (Acts 47th Leg., R.S. 1941, ch. 144, p. 199); See Lower Neches Valley Authority v. Mann, 140 Tex. 294, 167 S.W.2d 1011, 1017; A grant of $5,000 to Guadalupe-Blanco River Conservation and Reclamation District (Acts 44th Leg., 1st C.S. 1935, ch. 410, p. 1615); A loan of $15,000 was made to this District in 1939 (Acts 46th Leg., R.S. 1939, ch. 28, p. 501); A loan of $5,000 was made to the Pease River Flood Control District by the Act (cont'd)

Our Supreme Court, in upholding the constitutionality of the Rural Aid Appropriation Act of 1929, appropriating $5,000,000 to be apportioned to all children of scholastic age living in small and financially weak school districts, said:

"As has been shown, the Legislature since 1915 has consistently construed the Constitution as permitting the enactment of rural aid measures, and the executive department has approved and executed these laws. The universal rule of construction is that legislative and executive interpretations of the organic law, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any act, and in case of ambiguity or doubt will be followed by the courts, . . . ." Mumme v. Marrs, 120 Tex. 383, 40 S.W. 2d 31 (1931).

The rule of construction announced in Mumme v. Marrs, supra, is applicable here. The Legislature has over a long period of years construed the Constitution as permitting it to make grants of public money to conservation districts, without the necessity of declaring the existence of a public calamity therein. So far as we are aware, these grants have been withdrawn from the State Treasury in the same manner that other public funds of the State are withdrawn.

In view of all the foregoing, it is our opinion, that the grant of public money made by H.B. 97 (Acts 51st Leg., R.S. 1949, ch. 540, p. 1000) to Soil Conservation Districts created under the provisions of Article 165a-4, is constitutional.

For convenience, we restate your question No. 2:

"Can the Comptroller issue a warrant payable to a Soil Conservation District on funds drawn from the General Revenue Fund, based only on the certification of the State Soil Conservation Board, which funds can be deposited in the local depository of the Soil Conservation District and become a checking account of such district?"

---

1 cont'd. creating the District (Acts 44th Leg., 1st C.S. 1935, ch. 420, p. 1646); A further loan of $6,000 was made to this District in 1939 (Acts 46th Leg., R.S. 1939, ch. 28, p. 506); A loan of $2,000 was made to the Upper Red River Flood Control and Irrigation District by the Act creating the District (Acts 45th Leg., R.S. 1937, ch. 454, p. 1128); Another loan of $5,000 was made to this District in 1939 (Acts 46th Leg., R.S. 1939, ch. 33, p. 513).

578

Sections 2 and 6 of House Bill 97 read respectively as follows:

"Sec. 2. Approval of all grants to soil conservation districts as provided for in this Act, shall be certified to the State Comptroller of Public Accounts by the State Soil Conservation Board. Such certification of approval by the State Soil Conservation Board presented to the said Comptroller shall be sufficient authority for the Comptroller to issue his warrants against any appropriations made for grants to soil conservation districts, and shall also be sufficient authority for the State Treasurer to honor payment of such warrants."

"Sec. 6. Grants to soil conservation districts as provided in this Act, when received by the district, shall be deposited in the name of the district; such deposit shall be with a State or National bank or banks. Any withdrawal of such funds so deposited to the credit of the district may be withdrawn only on approval of the board of supervisors of the district. All checks or orders for such withdrawal shall be signed by the chairman and secretary of the board of supervisors of the district."

We have been unable to find any constitutional objection to the provisions of Sections 2 or 6 of H.B. 97. Therefore, we answer your second question in the affirmative.

Our affirmative answer to your second question makes unnecessary an answer to your third question.

Your eight remaining questions read as follows:

"4. Section 5 of H.B. 97 provides that 'any funds granted hereunder to any soil conservation district which shall remain unexpended at the end of the biennium shall revert to the General Fund . . .' If a district used the appropriation to buy grass seed, and within the biennium sold the grass seed for cash, so that at the end of the biennium cash received for the sale of the seed remained in the bank account of the district, would such cash revert to the General Fund? Stated differently, does disbursement of the appropriated money for merchandise to be resold constitute expenditure for the purpose of the bill? Would it make any difference whether the money received from such sales was placed in a separate bank account or commingled in the bank account with the appropriation received from the State Comptroller?"

"5. What is the relation between Section 3 of H.B. 97 and Section 6 of H.B. 444 of the 47th Legislature, which says that ' . . . the Supervisors . . . shall provide for an annual audit of the accounts of receipts and disbursements'? "

"6. Would the audit required by H.B. 97 cover only the original receipt and first disbursement, by a district, of the State appropriation, or would it include all receipts and disbursements? For example, would it cover receipts from the sale of seeds or fertilizer purchased out of State appropriations, or the funds of a district acquired by donation or from loans? "

"7. Would the fee for the audits, to be paid out of local funds of the districts, be paid into the State Treasury and made available to the State Auditor to pay the costs or expenses of making the audits? "

"8. Section 3 says in part: ' . . . The expense of the audit shall be paid by each Soil Conservation District involved out of local funds.' Will the funds received from the General Revenue Fund, on being deposited to local banks to the account of respective districts, become local funds to the extent that the districts can pay for the statutorily required audits from these funds which are, in fact, a part of their initial appropriation? "

"9. Does the provision that 'the charge in any particular project shall never be less than the actual cost to the particular district for labor, maintenance, depreciation, and replacement of equipment' at the end of paragraph 4D of H.B. 97, apply only to projects authorized in paragraph 4D, in both 4C and 4D, or to all the provisions of H.B. 97 and also to H.B. 444 of the 47th Legislature? "

"10. Does the provision at the end of paragraph 4B of H.B. 97 prevent the districts from buying seeds or plants to be resold at not less than cost to the district? "

"11. Will the districts be included in the political subdivisions of the State which are required to secure from depository banks a pledge of securities against the money deposited? "

We will answer these remaining questions in the order stated.

4.   It is our opinion that the Legislature intended, as to the granted funds, that all of such funds on hand at the end of the biennium revert to the General Fund.  The use of the granted funds to purchase seed to be resold would not constitute an expenditure of the funds so as to prevent the moneys received upon the resale from being a part of the granted funds.  The placing of the moneys received from the resale of the seed into a "separate bank account" would not have the effect of making the funds "expended."  If at the end of the biennium a soil conservation district has purchased seed on hand that is later resold, the amount received from the resale should then be paid into the General Fund of the State Treasury.

5.   Section 3 of H.B. No. 97, 51st Legislature, and Section 6 of H.B. No. 444, 47th Legislature, each provide for a separate audit, and such provisions have no relation to each other.  In other words, H.B. No. 97 does not, either directly or by implication, repeal or modify the provisions of H.B. No. 444 in reference to the audit therein provided for.

6.   The audit provided for in H.B. No. 97 is not by the terms thereof limited in its scope in any manner. It therefore contemplates a full and complete audit covering all receipts and disbursements of the audited district.

7.   The fees collected from the local funds of the soil conservation districts for the making of audits should be placed into the State Treasury.  Such funds will not be available to pay the costs or expenses of the State Auditor unless appropriated by the Legislature for that purpose.  H.B. No. 97 contains no such appropriation.

8.   H.B. No. 97 provides:  "The expense of the audit shall be paid by each Soil Conservation District involved out of local funds."  (Emphasis added)  The expense of the audit required by H.B. No. 97 can only be paid out of the district's "local funds" as distinguished from the moneys granted by the State in H.B. No. 97.  We are led to this conclusion by virtue of the clause "out of local funds."  Had the Legislature intended that these audit expenses be paid out of any funds available to the district, it would not have added the clause "out of local funds" to the sentence in question.  We can conceive of no other reason why the Legislature added said clause.  It is an elementary rule of statutory construction that each word, clause and sentence should be given a meaning, if possible.

9.   It is our opinion that the provision ". . . provided, however, that the charge in any particular project shall never be less than the actual cost to the particular district for labor, maintenance, depreciation and replacement of equipment" which appears in paragraph D of Section 4 of H.B. No. 97 applies only to those projects authorized in said paragraph.  The items mentioned, "labor, maintenance, depreciation, and replacement of equipment" are not applicable to the other

provisions of H.B. No. 97 or to the provisions of H.B. No. 444. However, as to the provisions of H.B. No. 97, and the expenditures authorized by H.B. No. 444, we call your attention to the provision of Section 52 of Article III of the Texas Constitution, which reads:

"The Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of vatue (value) in aid of, or to any individual, association or corporation whatsoever, . . . ."

The Supreme Court in Harris County Flood Control District v. Mann, 135 Tex. 239, 140 S.W.2d 1098 (1940), held that this constitutional provision prohibits the use of county funds to pay the bonds of a flood control district. The Supreme Court said:

"The Act of 1937 here involved contains the following provision: 'Should the necessity arise, the Commissioners' Court may supplement from its general funds any State taxes hereafter donated and granted, but no tax shall ever be levied or any debt be created against the County for such purpose without a vote of the people.' . . . .

"The Act of 1939 contains the following provision: 'Should the necessity arise, the Commissioners' Court may supplement the State taxes herein donated and granted from its general funds.' . . . ."

The State taxes donated and referred to in both the 1937 and the 1939 Acts were to the Harris County Flood Control District.

The Supreme Court, after quoting from the 1937 and 1939 Acts, then stated:

"By his fifth proposition the Attorney General contends that both of the above-quoted provisions are void, because in contravention of Section 52 of Article III and Section 59 of Article XVI of our State Constitution.

"So far as pertinent here, Section 52 of Article III of our State Constitution prohibits the Legislature from authorizing any county to lend its credit, or to grant public money or thing of value, in aid of any corporation whatsoever. We have already held that this District is a governmental agency and a body politic and corporate, separate and independent from Harris County. It follows that, under the plain terms of Section 52 of Article III, supra, no part of the funds of Harris County can be pledged or used to pay the bonds of this District."

A soil conservation district being a "political corporation" or subdivision of the State" within the meaning of these terms as used in Section 52, Article III of the Constitution of Texas, it is prohibited from either lending its credit or granting any of its funds in aid of, or to any individual, association or corporation whatsoever.

It follows, therefore, that in all instances where either H.B. No. 97 or H.B. No. 444 provides for the districts to furnish aid or assistance to other political subdivisions or to individuals, that such other political subdivisions or individuals must be charged and made to pay not less than the actual cost of the material or labor furnished.

Soil conservation districts may cooperate with agencies of either the State or the United States in carrying out conservation programs, but such districts cannot give or loan such other agencies (State and Federal) money received under H.B. No. 97. See Harris County Flood Control District v. Mann, supra.

10. The provision at the end of Section 4B of H.B. No. 97, which reads: " . . . provided, however, that the owner or occupier of such land shall be required to furnish all plants, seeds, grasses, legumes, trees and crops which may be planted upon such area or areas at no expense to the District" does not, in our opinion, prevent soil conservation districts from purchasing seed and reselling them to others for cash, at a price not less than the seed cost the district, when such seed are to be used for the purposes of soil conservation under the direction and authority of the district.

11. We have carefully considered all the provisions of Title 47, V.C.S., which provide for State, county, city and special depositories. None of these provisions are deemed applicable to or apply to soil conservation districts. Neither does H.B. No. 97, or H.B. No. 444 make any provision for the districts to secure pledges of securities from depository banks. We are therefore of the opinion that soil conservation districts are not included in the political subdivisions of the State which are required to secure from depository banks a pledge of securities against the money deposited. However, there is nothing in our statutes that would prohibit the districts in question from requiring their depository banks to make the pledges in question.

## SUMMARY

Soil Conservation Districts created under Article 165a-4, V.C.S., a statute enacted pursuant to the mandatory provisions of Section 59a, Article XVI of the Constitution of Texas to carry out the purposes of such constitutional provision, are political subdivisions of the State, bodies politic and corporate, performing governmental functions. Willacy County Water Control and Improvement District No. 1 v. Abendroth, 142 Tex. 320,

177 S.W.2d 936 (1944). Such districts are competent agencies of the State through which the State may perform a part of its governmental functions. Brazos River Conservation and Reclamation District v. Mc-Craw, 126 Tex. 506, 91 S.W.2d 665 (1936); Harris County Flood Control District v. Mann, 135 Tex. 239, 140 S.W.2d 1098 (1940).

The Legislature is not prohibited by Section 51, Article XVI of the Constitution of Texas, or any other provision of the Constitution, from making grants of public money to such districts for a period of two years, when such grants are to be used by them in performing a part of the duties or governmental functions of the State of Texas. Bexar County v. Linden, 110 Tex. 339, 220 S.W.2d 761 (1920); City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S.W. 818 (1923); Jefferson County v. Board of County and District Road Indebtedness, 143 Tex. 99, 182 S.W.2d 908 (1944).

There is no constitutional objection to the provisions of Sections 2 and 6 of H.B. 97, supra, providing for the issuance of warrants by the Comptroller to Soil Conservation Districts; the payment of such warrants by the State Treasurer; and the depositing of the proceeds derived therefrom by each Soil Conservation District in a State or National Bank, subject to withdrawal by the particular district in the manner provided in Section 6.

The answers to eight additional questions are summarized in the body of the opinion.

Yours very truly,

PRICE DANIEL
Attorney General

APPROVED:

C. K. Richards
Appellate Division

Bruce W. Bryant

Charles D. Mathews
Executive Assistant

Price Daniel
Attorney General

W. V. Geppert
              Assistants

BWB:WVG:v