# FEBRUARY, 1936

## BRAZOS RIVER CONSERVATION AND RECLAMATION DISTRICT V. WILLIAM MCCRAW, ATTORNEY GENERAL.

No. 7021.   Decided February 5, 1936.
(91 S. W., 2d Series, 665.)

*W. M. Harman,* of Waco, *John D. McCall* and *Millard Parkhurst,* both of Dallas, for relator.

The Act of the Legislature creating the conservation and reclamation district having definitely defined said district to include all the territory lying within the watershed of the Brazos River, no hearing as to benefits is necessary. State v. Ball, 116 Texas, 527, 296 S. W., 1085; Browning v. Hooper, 269 U. S., 396, 46 Sup. Ct., 141, 70 L. Ed., 330; Gulf, C. & S. F. Ry. Co. v. State, 167 S. W., 192.

The bonds are not a charge against the property of said district within the meaning of Section 10 of Chapter 13, Acts 41st Legislature, 2 c. s. or within the meaning of Article 16, Section 59 of the Constitution. City of Houston v. Allred, 123 Texas, 334, 71 S. W. (2d) 251; McCann v. Akard (Com. App.), 68 S. W. (2d) 1033.

The bonds do not make a grant of public money, nor do they attempt to give or lend the credit of the State. International & G. N. R. R. Co. v. Reagan, 121 Texas, 233, 49 S. W. (2d) 414; Fitzgerald v. Boyles, 66 S. W. (2d) 347.

*William McCraw,* Attorney General, *Effie Wilson-Waldron* and *Victor W. Bouldin,* Assistants Attorney General, for respondents.

In support of the objections, set forth in the opinion, the Attorney General cited the following authorities: City of Fort Worth v. Bobbitt, 121 Texas, 14, 41 S. W. (2d) 228; McNeil v. City of Waco, 33 S. W., 322; City of Corpus Christi, 58 Texas, 465; Terrell v. Middleton, 187 S. W., 367; Neil v. Keese, 3 Texas, 23; 9 Texas Jur., 434.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This is an original proceeding brought by the Relator against the Attorney General for writ of mandamus directing that officer to approve proposed bonds of the District in the sum of $3,600,000.00 as provided by law. The District was created by Chapter 13, Local and Special Laws of the Forty-first Legislature, Second Called Session, and became effective October 2, 1929. There are subsequent acts touching the subject matter of this proceeding, but Chapter 368, General and Special Laws of the First Called Session of the Forty-fourth Legislature, sometimes referred to as Senate Bill No. 3, effective September 23, 1935, is the principal one here involved. The District was created and its powers defined by the acts to which we have made reference, which in turn find their sanction primarily in Section 59, Article XVI, of the Constitution, known generally as the Conservation Amendment, adopted in 1917, copied in full in the footnotes to this opinion.[1]

The Act creating the District, as amended by Chapter 19, General Laws of the Forty-fourth Legislature, states in detail its object and purposes, all of which are consistent with the Conservation Amendment. This specification reads as follows:

---

[1]"Sec. 59. (a) The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its over-flowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

"(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be govern-

"Sec. 3. The Brazos River Conservation and Reclamation District shall have and be recognized to exercise, in addition to all the general powers vested by virtue of the constitution and statutes in a governmental agency and body politic and corporate, for the greatest practicable measure of the conservation and beneficial utilization of storm, flood and unappropriated flow waters, the powers of control and employment of such flood, storm and unappropriated flow waters of said district in the manner and for the particular purposes hereinafter set forth.

"(a) To provide through the only practical and legal means for the control and the coordination of the regulation of the waters of the watershed of the Brazos River and its tributary streams as a unit.

"(b) To provide by adequate organization and administration for the preservation of the equitable rights of the people of the different sections of the watershed area in the beneficial use of storm, flood and unappropriated flow waters of the Brazos River and its tributary streams.

"(c) For storing, controlling and conserving storm, flood and unappropriated flow waters of the Brazos River and its tributaries, and the prevention of the escape of any of such waters without the maximum of public service; for the prevention of devastation of lands from recurrent overflows, and the protection of life and property in such watershed area from uncontrolled flood waters.

"(d) For the conservation of waters essential for the domestic uses of the people of the watershed of the Brazos

mental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law.

"(c) The Legislature shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment, and all such indebtedness may be evidenced by bonds of such conservation and reclamation districts, to be issued under such regulations as amy (may) be prescribed by law and shall also, authorize the levy and collection within such districts of all such taxes, equitably distributed, as may be necessary for the payment of the interest and the creation of a sinking fund for the payment of such bonds; and also for the maintenance of such districts and improvements, and such indebtedness shall be a lien upon the property assessed for the payment thereof; provided the Legislature shall not authorize the issuance of any bonds or provide for any indebtedness against any reclamation district unless such proposition shall first be submitted to the qualified property tax-paying voters of such district and the proposition adopted. (Sec. 59, Art. 16, adopted election Aug. 21, 1917; proclamation October 2, 1917.)"

River and its tributaries, including all necessary water supplies for cities and towns.

"(e)  For the irrigation of lands in the watershed of the Brazos River and its tributary streams where irrigation is required for agricultural purposes or may be deemed helpful to more profitable agricultural production; and for the equitable distribution of storm, flood and unappropriated flow waters to the regional potential requirements for all uses.  All plans and all works provided by said districts, and as well, all works which may be provided under authority of said district should have primary regard to the necessary and potential needs for water, by or within the respective areas constituting the watershed of the Brazos River and its tributary streams.

"(f)  For the better encouragement and development of drainage systems and provisions for drainage of lands in the valleys of the Brazos River and its tributary streams needing drainage for profitable argricultural production; and drainage for other lands in the watershed area of the district requiring drainage for the most advantageous use.

"(g)  For the purpose of conservation of all soils against destructive erosion and thereby preventing the increased flood menace incident thereto.

"(h)  To control and make available for employment flood, storm and unappropriated flow waters in the development of commercial and industrial enterprises in all sections of the watershed area of the district.

"(i)  For the control, storing and employment of flood, storm and unappropriated flow waters in the development and distribution of hydro-electric power, where use may be economically coordinated with other and superior uses, and subordinated to the uses declared by law to be superior.

"(j)  And for each and every purpose for which flood, storm and unappropriated flow waters when controlled and conserved may be utilized in the performance of a useful service as contemplated and authorized by the provisions of the Constitution and the public policy therein declared.

"(k)  Nothing in this Act shall affect or repeal Articles 7496, 7500A of 1925 Revised Statutes or Article 7471 Revised Statutes of 1925 as amended by Chapter 128 Acts of the Regular Session of the 42nd Legislature."

Section 5 of the original Act creating the District defined the boundaries of the District, which was established "to comprise the whole of all counties lying wholly or in part in the watershed of the Brazos River and its tributary streams"

as the same was shown on the official contour maps then on file in the office of the State Board of Water Engineers. It was provided in this section that the Board of Water Engineers should, after the passage of the Act, determine the actual boundaries of the area within the watershed so that the same could be expressed in written calls for metes and bounds, etc. This feature of the organization of the District, as well as all others, has been complied with in accordance with the law. The map accompanying this opinion shows the location and a

general outline of the boundaries of the District, being the territory between the heavy dark lines and designated *"Brazos River Watershed."* The map is attached only for the purpose of showing in a general way the size and location of the District in relation to the State at large, and not its actual boundaries on the ground as they may relate to any particular tract of land. An examination of the map discloses that the

District begins on the high plains and runs substantially from Parmer, Bailey and Cochran Counties at the west boundary of Texas in a southeasterly direction to Brazoria County on the Gulf of Mexico, containing within its boundaries 44,600 square miles, in all or a part of sixty-five counties through the approximate center of Texas. The names of the counties are given in the footnote below.[2]

This Court on another occasion described the general physiographic aspects of this State as related to its river systems. We refer to that opinion for such a description rather than to restate here what was there said. Motl v. Boyd, 116 Texas, 82, 113, 286 S. W., 458.

The general physiographic description cited applies to the Brazos River and its watershed. The Brazos River rises on the high plains of New Mexico, about forty miles west of the Texas boundary line and flows, as shown by the map, across the State and enters the Gulf of Mexico at Freeport, having a total length of about thirteen hundred miles. The width of the watershed is about sixty miles on the plains, increasing to approximately one hundred ten miles at Waco, where it traverses the Balcones fault line and enters the coastal plain. Towards the estuary the watershed narrows down to from ten to twenty miles over a distance of sixty miles. After the river descends toward the coastal plain it traverses regions of increasingly large rainfall, from fifteen to twenty inches annually near the source to from forty to forty-five inches at the Gulf. The river has many tributaries, as shown by the accompanying map. The main stream can be divided into two well-defined parts at or about the City of Waco. The upper part flows nearly everywhere in a rocky channel, and is more stable than in the lower, where, like other meandering streams, the river changes its configuration by the corrasion of the moving waters against its friable banks. Above Waco, the valley of the river is not subject to overflow to any very great extent, but below Waco the entire valley is inundated during large floods. Near the estuary flood waters of the Colorado and Brazos Rivers on occasion meet and the two river floods

---

[2]Austin, Archer, Bailey, Bastrop, Baylor, Bell, Borden, Bosque, Brazoria, Brazos, Brown, Burnet, Callahan, Castro, Cochran, Comanche, Coryell, Crosby, Dickens, Eastland, Erath, Falls, Fisher, Floyd, Fort Bend, Garza, Grimes, Hale, Hamilton, Haskell, Hill, Hockley, Hood, Jack, Johnson, Jones, Kent, King, Knox, Lamb, Lampasas, Lee, Limestone, Lubbock, Lynn, McLennan, Milam, Mills, Nolan, Palo Pinto, Parker, Parmer, Robertson, Scurry, Shackelford, Somervell, Stephens, Stonewall, Taylor, Throckmorton, Waller, Washington, Williamson, Young.

thus. joined present the spectacle of a great inland sea moving toward the Gulf of Mexico. Motl v. Boyd, 116 Texas, pp. 82, 114, 286 S. W., 458.

The agreed statement of facts before us shows "that from 1913 to 1929 property losses from floods in the Brazos Valley aggregated $29,000,000, and that 346 people were drowned during said period 'in said valley." It has been estimated by public authorities that storms and overflows in the Valley of the Brazos from 1891 to 1932 destroyed property to the extent of $53,780,000 and took the lives of four hundred forty-two people. The violence of these floods in the Brazos and its tributaries is very well illustrated by the flood of Little River, one of the tributaries of the Brazos, in 1921. We have heretofore, in the case of Motl v. Boyd, 116 Texas, 82, 113, 286 S. W. 458, had occasion to notice this flood. In that case we said in part:

"Illustrative of the Texas type of flood is that of Little River in Central Texas in the 1921 flood. This stream has a length of 237 miles from its head-waters to Cameron, with a drainage area of about 7,000 square miles, and a slope of about 5.52 feet per mile. During this flood the maximum discharge at Cameron was *647,000 cubic feet of water per second*. United States' Geological Survey Water Supply Paper No. 488, pp. 18, 19. Some idea of the vastness of this discharge will be gained by noting that it is approximately one-third of that of the Mississippi River at flood stage. This flood was more or less general over central Texas, caused a loss of 224 lives, and destroyed or damaged property amounting to ten millions of dollars. Water Supply Paper, supra. In 1913 there was a destructive flood, measurably over this same area, which caused the loss of 177 lives and destroyed property valued at more than $8,500,000."

The principal damage from overflows by the Brazos River lies south and southeast of Waco. The counties suffering most from this cause are shown in shaded portions or in colors along the lower reaches of the Brazos, beginning with Milam and Robertson Counties and extending to the Gulf of Mexico. Illustrative of the damage caused by the floods of the Brazos River or its tributaries is that which occurred in Milam County at the time of the Little River flood just above referred to, when more than one million dollars worth of property was destroyed in that county.

That large and destructive floods have characterized the Brazos River from the earliest times is a matter of history,

and may be verified by reference to historical works, government reports, legislative acts, etc. See also Wallis' "Sixty Years on the Brazos," pp. 82 and 83.

The economic importance of the Brazos River watershed can hardly be over estimated when considered with reference to the individuals who inhabit that area or with reference to the general wealth and prosperity of the State, its inhabitants, its railways and industrial enterprises. The assessed valuation of its property is $750,000,000, the population approximately 1,500,000, or about twenty-seven per cent of the population of the State. It has more population than either Arizona, Colorado, Delaware, the District of Columbia, Idaho, Maine, Montana, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, South Dakota, Rhode Island, Utah, Vermont or Wyoming. It has a greater area than any of some fifteen states in the Union.

This watershed comprises one of the largest agricultural regions of Texas, and contains extensive natural gas and oil fields. It contains within its bounds more than 3,500 miles of main line railroad, and in excess of this mileage of Federal and State highways. Within this watershed there is nearly ten million acres of land in cultivation, the cotton acreage alone is more than four and one-half million acres; within the area there are more than one and one-half million head of cattle, more than one-half million head of sheep, and more than a quarter of a million head of hogs; the annual production of minerals runs into millions of dollars; and within the area there are many towns and cities, factories, etc.

The agreed statement of facts not only shows that the State not only owns and operates a great many miles of State Highways in the watershed of the Brazos, but a great number of expensive bridges as well, "which are constantly imperiled and frequently damaged or destroyed on account of said flood waters; that the soil in parts of the watershed is becoming badly eroded due to lack of control of said waters." The State through its Prison System also owns and operates 57,000 acres in Prison Farms in Fort Bend and Brazoria Counties which are subject to periodical overflows of the Brazos, which have occasioned the loss of $3,000,000 in property to the State during the last fifteen years.

In the Statement of Facts it is agreed that the Brazos River is navigable in law and fact. In this connection we may historically say that the Brazos River was navigated from an early date (1836) by boats of substantial size carrying large

quantities of cotton and other freight until the coming of the railroads, and that until comparatively recent dates efforts to improve the river for navigation purposes have been made. Wallis' "Sixty Years on the Brazos," pp. 85 and 86; Vol. 12 Senate Documents, 1st Session 33rd Cong. (Ex. Doc. 84), p. 1; Annual Report of U. S. Chief of Engineers (1905), Appendix U, p. 392; Annual Report U. S. Chief of Engineers (1915), p. 908; Hurwood's Survey of the Brazos River, 1890; Speech of Senator Morris Sheppard, Sept. 14, 1914, as officially published; Published Report of the Brazos River Navigation Convention held at Brenham Oct. 26, 1899; Published address of the Velasco Board of Trade 1894; De Bow's Review, Vol. 10, p. 684 (1851); 4 Gammel's Laws, p. 121 (1854), p. 1095 (1858); 3 Gammel's Laws, p. 571 (1850), p. 627 (1850), p. 854 (1850); 5 Gammel's Laws, p. 1440 (1866); 8 Gammel's Laws, p. 331 (1874); 9 Gammel's Laws, p. 219 (1881); 10 Gammel's Laws, p. 1316 (1897); Wall and Williams' "Following General Sam Houston," p. 117.

We have thus stated at some length the history, characteristics, and economic importance of the Brazos River and its watershed, because it is as to this area that the legal questions here involved are to be decided.

In the statement of facts before us it is agreed: "That the completion of the improvements authorized in Senate Bill No. 3, passed at the First Called Session of the Forty-fourth Legislature, are of vital importance to the State of Texas as a whole."

From the foregoing it is apparent that we have before us a Conservation and Reclamation District of large proportitons, created by the Legislature itself, comprehending an integral and important part of the State, reaching from the western boundary of Texas, through the heart of its populous and productive territory, to the Gulf of Mexico.

It is obvious that this District is quite different in its origin and purpose from the small conservation and reclamation districts organized by property owners within their boundaries, primarily for their own protection and benefit, under statutes provided for that purpose. The one is basically a public enterprise, created by the Legislature for the general governmental purpose of effectuating the objects of the conservation amendment; the other is of a different type, organized primarily for private purposes under the permissive terms of the Constitution and the Statutes. That the relationship of the State and the power of the Legislature with reference to the two types

of district may be different, is obvious; particularly in view of the fact that under the Conservation Amendment, Article 16, Section 59, Subdivision (b), it is provided that Conservation and Reclamation Districts are to have "such powers of government, and with the authority to exercise such rights, privileges and functions * * * as may be conferred by law."

It is also obvious that there exist, or it is contemplated that there may exist, municipal corporations, political subdivisions, and Conservation and Reclamation Districts, or districts which serve these purposes, organized under the statutes and constitutional provisions touching the subject, within the boundaries of the Brazos River Conservation and Reclamation District. The relationship and relative rights of such municipal corporations, political subdivisions, and districts to the District before us are not involved in the instant controversy, and any discussion thereof is pretermitted. This opinion concerns only the Brazos River Conservation and Reclamation District and the validity of the bond issue before us.

The record in this case shows:

The United States Government has made a grant to the Relator District in the amount of $30,092,345.00 to finance or aid in financing some thirteen reclamation projects, each consisting in the erection of a dam across the Brazos River or one of its tributaries, and the equipment of certain of said dams for the manufacture of hydro-electric power. This grant is contingent upon the District's securing funds sufficient to purchase the lands, etc., needed for said purposes.

The Board of Directors of the District has adopted a resolution authorizing the issuance of $3,600,000.00 of bonds, and has provided therein that said bonds shall be secured by and shall be payable out of the State taxes granted to the District by Senate Bill 3. Inasmuch as the revenues from the operation of the various projects could not be forecast with a reasonable degree of accuracy at this time, the Board decided first to issue the bonds secured primarily by a pledge of the allocated taxes, and secondarily by current revenues; and at a later date to issue $5,000,000.00 of bonds secured primarily by the revenues from the operation of the projects.

To aid the District in carrying out its purposes the State by Chapter 368, General Laws of the First Called Session of the 44th Legislature, allocated to the District for twenty years the State ad valorem taxes to be collected for general revenue purposes upon the property and from persons in *Austin, Brazoria, Burleson, Fort Bend, Grimes, Waller, Washington,*

*Brazos, Milam,* and *Robertson* Counties, each of which is within the section of periodic overflows of the Brazos River; provided, however, that in no event should the amount granted exceed in any one year a total sum of $309,000.00.

The Act contains full directions as to the duties of public collecting officers with reference to collecting and turning over the sums of money obtained from the sources stated directly to the District. The District is authorized to issue a certain type of bond, *secured only by the pledge of the sums granted above and out of any other current revenues of the District,* and *not by* taxes to be levied by the District under the terms of Subdivision (c) of the Conservation Amendment. These provisions are in Section 5 of the Act, which reads:

"Sec. 5. The District shall have the authority and it is hereby authorized to issue its negotiable bonds, secured only by pledge of the sums granted and/or donated by the State of Texas and/or out of any other current revenues of the District in any such amounts as may be authorized by the Directors of such District, which sums shall be paid to the legal holders of said bonds, for the purpose of purchasing, acquiring and/or condemning lands, leases, easements and/or acquittances, rights-of-way, structures and/or buildings, equipment and/or operation of proper structures, dams, reservoirs, suitable *for the control of the recurrent, devasting floods in the valley of the Brazos River, which have, over a long period of years, caused a deplorable loss of life and property, and the erosion of the soil and a depletion of the fertility of the lands in said valley and the water-shed served by the Brazos River in Texas, and the public highways and structures and lands belonging to the State of Texas situated within said water-shed; all of which is hereby declared to be a public calamity,* and doing all things necessary in the execution of the purposes for which the District is created and exists. The moneys herein and hereby granted and/or donated to the Brazos River Conservation and Reclamation District are declared to be for the purposes of discharging obligations herein authorized." (Italics ours.)

When the proposed bonds and bond record were presented to the Attorney General, he declined to approve the same, specifying his objections; and this application for mandamus followed.

■ The first objection is that the Act which created the Brazos River Conservation and Reclamation District was invalid, be-

cause it failed to set out the boundaries of the District, but delegated the authority to determine the boundaries to the Board of Water Engineers. It was only necessary for the Board of Water Engineers to ascertain the boundaries of the land within the "watershed" of the District. It is elementary that the Legislature may delegate to an administrative officer the ascertainment of facts of this character. The fact is that in the creation of the various Texas counties this very method has frequently been pursued. The objection is without merit. 9 Texas Jurisprudence, pp. 493, 497, §§ 68, 70; Parker v. Harris County Drainage District, 148 S. W., 351.

This District was created directly by legislative enactment, and, of course, no hearing was necessary on the question of benefits. State v. Ball, 116 Texas, 527, 296 S. W., 1085.

■ The objection that the proposed bonds had not been authorized by a vote of the taxpaying voters of the District is untenable. The bonds are not payable out of money to be raised by taxation levied by the District itself as a governmental agency. As we held in the Lower Colorado River Authority Case, a vote of the qualified property taxpaying voters of this District is not necessary to the validity of these bonds. These bonds can never be serviced by a tax on the properties of the District as such. They, therefore, do not constitute indebtedness within the meaning of Subsection (c), Section 59 of Article XVI of our Constitution. In other words, these bonds can never become a claim against any tax funds of this District. It is true that they are secured by the State tax funds allocated by the Act, and by the revenues of such District subject to the limitations set out in the bonds, but these bonds do not place any burden upon the taxpayers of the District, and it is unnecessary that their issuance be authorized by vote. Lower Colorado River Authority v. McCraw, 125 Texas, 268, 83 S. W. (2d) 629; City of Houston v. Allred, 123 Texas, 334, 71 S. W. (2d) 251; City of Dayton v. Allred, 123 Texas, 60, 68 S. W. (2d) 172; McCann v. Akard (Com. App.), 68 S. W. (2d) 1033; 59 Corpus Juris, p. 225, § 370.

■ The objection that the Act is an attempt to authorize the Board of the District to create a debt in behalf of the State, or lend the credit of the State in violation of the inhibitory provisions of Sections 49 and 50 of Article 3 of the Constitution, is without merit. No debt on the part of the State is to be created, nor is the State's credit loaned for that purpose. These questions are foreclosed by the opinion of this Court in

the case of City of Aransas Pass v. Keeling, 112 Texas, 339, 247 S. W., 818.

■ The objection that the Act attempts to grant and donate to the District for a period of twenty years public money in the form of taxes, not to exceed $309,000.00 in one year, in violation of Article 3, Section 51, of the Constitution of Texas, is untenable. This Section in part reads:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporations whatsoever; * * *."

The grant or allocation of taxes made to the District by the Legislature was made under the proviso contained in the section of the Constitution just quoted, to the effect that its inhibitory terms shall not be construed to prevent the granting of aid in cases of public calamity. Under that proviso the granting of aid in cases of public calamity is a constitutional duty of the State, and the performance of the duties entailed are governmental duties which may be conferred upon or required of a governmental agency. The language of the proviso is broad, the word "aid" alone being used to define what the Legislature may do. It is obvious that the method or methods of granting "aid" are to be selected by the Legislature, and may comprehend any method reasonably calculated to achieve the constitutional purpose. Historically, "aid" was a term applied on occasion in parliamentary grants of taxes and subsidies to the Crown, and has since been applied to many methods of succor or relief. Webster's New International Dictionary (2d ed.); Union Pac. R. R. v. Colfax County, 4 Neb., 450; State v. Babcock, 19 Neb., 230, 27 N. W., 101; People v. Town of Granville, 104 Ill., 291; Garland v. Montgomery Co., 87 Ala., 223, 6 So., 402; State v. Ziegenheim, 144 Mo., 283, 45 S. W., 1099, 66 Am. St. Rep., 420; Synod of Dakota v. State, 2 So. D., 366, 14 L. R. A., 418, 50 N. W., 632.

In the case of Aransas Pass v. Keeling, 112 Texas, 339, 247 S. W., 818, this Court had before it an act of the Legislature, an allocation of taxes, similar to that here involved, for twenty years, granted under Section 8 of Article 11 of the Constitution, permitting, as construed by us, the Legislature to grant "aid" to cities on the Gulf Coast "in such mode as may be provided by law." We sustained the grant, although there, as here, it took the form of an allocation of taxes for a twenty-year period, to be used in constructing work to protect the

city from future public calamities. This case concludes the question as to the right of the Legislature to make the tax allocation involved.

It is to be noted that the taxes granted are on property beginning with Milam and Robertson Counties and extending to the Gulf of Mexico, the counties which suffer from the destructive floods of the Brazos River, recurring calamities which have afflicted this region from the earliest times to the present day; counties in which this river during its periods of overflow becomes a great moving sea,—devastating land, eroding the soil, destroying many human lives and untold millions of property. In every sense of the word the existence of this river uncontrolled is a continuing public calamity, to relieve which the State plainly has authority under the very constitutional provision invoked by the Attorney General to grant public money for relief. The legislative Act before us declares that the recurring floods of the Brazos River are public calamities; a fact which we judically know, and which is a matter of past and current history.

The Conservation Amendment to the Constitution of the State expressly declares that the performance of the duties prescribed for this District are *"public rights and duties,"* and the Legislature is commanded to *"pass all such laws as may be appropriate thereto."* This the Legislature has done with reference to the District here involved, one of the major objects of which is the prevention of public calamities due to floods in the Brazos River valley. (See the specification of the objects and purposes of this District as previously quoted). In allocating these taxes to this District the State is merely carrying out in its own way the commands contained in Section 51, Article 3, and in the Conservation Amendment to the Constitution of the of this State. Since the purpose of the tax allocation before us is a constitutional one, and the agency selected,—viz. the District before us, a competent one under the Constitution and Statutes to receive it and perform the duties entailed, the grant is valid as against the objection made by the Attorney General. Bexar Co. v. Linden, 110 Texas, 339, 220 S. W., 761; Road District of Shelby Co. v. Allred, 123 Texas, 77, 68 S. W. (2d) 164, 169; City of Arsansas Pass v. Keeling, Attorney General, 112 Texas, 339, 247 S. W., 818.

Nor is there any merit in the eighth objection made by the Attorney General, as to the validity of the Act before us, to the effect that the Act attempts to make an appropriation of public money for a longer term than two years,—namely,

twenty years; in violation of Article 8, Section 6, of the Constitution of Texas, which provides:

"Section 6. No money shall be drawn from the treasury, but in pursuance of specific appropriations made by law; nor than two years, * * *."
shall any appropriation of money be made for a longer term

This objection was made to the Act involved in the case of Aransas Pass v. Keeling, 112 Texas, 339, 247 S. W., 818, which is discussed above, the Attorney General saying:

"That the act violates Section 6, of Article 8 of the Constitution, forbidding the appropriation of money for a longer period of time than two years, in that the act undertakes to appropriate state taxes to be collected in San Patricio County for a period of twenty years."

This Court, in an opinion by Associate Justice Greenwood, held the Act valid in all respects. As to the matter here involved, he said the right of the Legislature to allocate or grant the taxes to the city "was not limited by the terms of Section 6, of Article 8, forbidding the appropriation of public money for a longer period than two years."

As we stated above, the constitutional provision before Justice Greenwood in that case authorized the grant of *"aid"* to the Gulf coast cities *"in such mode as may be provided by law."*

The allocation involved in the instant case is by virtue of Section 51, Article 3, of the Constitution, which authorizes *"aid in cases of public calamity."* It is obvious that the power of the Legislature in so far as here involved is just as broad under Section 51, Article 3, as under Section 8, Article 11, the constitutional provision before this Court in the Aransas Pass Case; and if Section 6, Article 8 of the Constitution was not a limitation in the one case, it can not be held to be so in the other.

■ The seventh objection of the Attorney General, that the Act before us attempts to divert from its purpose a *special fund* which ought to come into the Treasury of the State, in violation of Section 7, Article 8, of the State Constitution, is without merit. The Act before us makes no attempt to divert any *special fund* which may or ought to come into the Treasury. The taxes allocated to the District are taxes which would come into the General Fund of the Treasury, and not into any special fund. 59 Corpus Juris, p. 232, § 378. There are various *special funds* named in the Constitution, such as the School Fund, etc.,

and the purpose of Section 7, Article 8, was to prevent their diversion. The special funds of course can not be diverted; but the provision named has no application to the General Fund of the Treasury, or which might come into the Treasury. 59 Corpus Juris, p. 232, § 378; 61 Corpus Juris, p. 1520; § 2234, 2235; Collin v. Humphrey, 181 Ark., 609, 27 S. W. (2d) 102; McKay Texas Const. Debates, p. 311.

The ninth objection made by the Attorney General is that the Act before us attempts to release the inhabitants of and the property in the ten counties heretofore described from State taxes, accrued and to accrue, in violation of Article 8, Section 10, of the Constitution of the State. The answer is that the Act makes no attempt to release the inhabitants of these counties from any tax. It is obvious that this section of the Constitution has no application to the Act before us.

■ The next objection by the Attorney General is that the bond order here attempts to authorize the issuance of two kinds of bonds, whereas the governing Act provides that bonds issued by the District shall be secured by both such granted and donated taxes and by the revenues of the project. Upon a careful reading of the provisions of the Act, we think this objection without merit.

The Attorney General's objection that there is no adequate certain method of securing the payment of the bonds attempted to be authorized by the Board of Directors of the District is untenable. City of Aransas Pass v. Keeling, 112 Texas, 339, 247 S. W., 818; see also Lower Colorado River Authority v. McCraw, 125 Texas, 268, 83 S. W. (2d) 629.

The objections of the Attorney General are without merit, and the mandamus will accordingly issue.

Opinion delivered February 5, 1936.