BACHE HALSEY STUART SHIELDS,
INCORPORATED, Appellant,

v.

UNIVERSITY OF HOUSTON, Appellee.

No. 18045.

Court of Appeals of Texas,
First District.

May 13, 1982.

Rehearing Denied June 12, 1982.

Corbet F. Bryant, Jr., Carrington, Coleman, Sloman & Blumenthal, Dallas, Ed Murr, Houston, for appellant.

Mark White, Atty. Gen., Jerry D. Cain, Asst. Atty. Gen., Austin, for appellee.

Before PEDEN *, DUGGAN and BASS, JJ.

BASS, Justice.

This suit involves transactions entered into between appellant, Bache, Halsey, Stuart, Shields, Inc. ("Bache"), a brokerage firm, and two employees of appellee, the University of Houston (the "University"). On appeal Bache asserts twenty-seven points of error, while the University raises eight counterpoints. To simplify the case, the points of error and counterpoints have been grouped under the five following questions: 1) Is a repurchase agreement a "debt" within the meaning of art. III, § 49 of the Texas Constitution? 2) Is a repurchase agreement involving government securities, such as Government National Mortgage Association securities and Federal National Mortgage Association securities, "an investment in government securities"? 3) Were the employees representing the University in these transactions properly authorized to act for it? 4) Did the trial court err in refusing to allow appellant Bache a trial amendment? 5) What amount of damages, if any, should be assessed?

Appellant is a national brokerage firm headquartered in New York. Appellee is a state university in Texas. In addition to the University and Bache, three University of Houston employees intricately involved in the transactions leading up to the lawsuit should be identified for a clearer understanding of the facts: (1) D. G. MacLean, Vice President, Financial and Management Services, chief financial officer of the University, (2) J. T. Brogden, second highest financial officer, and (3) Sam Harwell, financial analyst for the University.

In January of 1976, Bache's Houston office was approached by the University's financial analyst, Harwell, who desired to open several accounts with Bache on behalf of the University. As financial analyst, Harwell's duty was to assist Brogden and to manage the University's temporary investment portfolio. He contacted Bache in hopes of maximizing the University's investment earnings by selling and purchasing government securities. The main instruments by which Harwell hoped to accomplish this objective were repurchase agreements, reverse repurchase agreements, "when issued" securities agreements, and stand-by commitments.

Before it was willing to trade with Harwell as the University's representative, Bache requested documentation from the University indicating Harwell's authority to deal on behalf of the University. Brogden sent two documents in response to appellant's request. One was a resolution of the University Board of Regents authorizing the President of the University, MacLean and Brogden "... to sell, assign, transfer, and deliver any stocks, bonds, and other securities...." on behalf of the University. Accompanying the resolution was a letter signed by Brogden and Harwell informing

* Associate Justice Peden, having resigned effective October 20, 1981, did not participate in the opinion.

Bache that Harwell was "... authorized to purchase, sell, assign, transfer, and deliver ..." government securities for the University. After receiving these documents, Bache opened the accounts and began trading with the University through Harwell.

Harwell continued managing temporary investments from January of 1976 until late November of 1977, when he was terminated by the University. At this time, the University notified Bache by letter that Harwell would no longer be acting for the University, and that the University would not complete the repurchase agreements due to mature in November and December of 1977 and in January of 1978, all negotiated by Harwell. The University suggested that Bache liquidate the securities on the open market, which Bache did, selling the securities for $581,781.39 less than the agreed repurchase price. The notice of Harwell's termination was the first indication received by Bache that the University considered Harwell unauthorized to act on the University's behalf.

The University of Houston, pressured by Bache's request for remuneration for the loss it incurred in selling the securities on the open market, initially requested a declaratory judgment that it owed nothing to Bache. Bache counterclaimed for its $581,781.39 loss incurred in the resale and in the alternative asked for recovery of $2,179,139.94 under a theory of unjust enrichment. The University then amended its original petition and requested judgment for $1,703,202.46, the amount it previously paid to Bache as interest on the transactions.

At the close of the evidence, appellant moved for leave to file a trial amendment to conform the pleadings to the evidence, asking that the amount of award sought under its theory of unjust enrichment be increased from $2,179,139.94 to $27,434,493.43, if the underlying transactions with the University were found to be void. The motion was denied.

The trial court entered a take-nothing judgment against both parties. It also made the following findings of fact pertinent to this appeal:

1) Neither Harwell nor Brogden nor the University of Houston was authorized to enter into the transactions in question;

2) The repurchase agreements entered into were violative of Tex.Const. art. III, § 49;

3) The repurchase agreements entered into were not investments in United States securities or obligations guaranteed by the United States or direct obligations of any agency listed in Tex.Rev. Civ.Stat.Ann. art. 6252–5a (Vernon 1970);

4) The transactions involved were not authorized by the Texas State Treasurer or the Texas Comptroller of Public Accounts, and the State Treasurer did not designate a bank or Federal Reserve Bank to which securities could be deposited, as required by TEX.CIV.STAT.ANN. art. 6252–5a;

5) Bache was negligent in failing to ascertain the scope of authority conferred on Brogden and Harwell.

## IS A REVERSE REPURCHASE AGREEMENT A DEBT WITHIN THE MEANING OF TEX.CONST. art. III, § 49?

In point of error nineteen, appellant claims the "court erred in finding that Bache seeks recovery on debts within the prohibitions of Article 3, § 49 of the Texas Constitution and that such finding is incorrect as a matter of law."

The resolution of the case depends substantially on the characterization given to repurchase agreements.[1] If a repurchase agreement is a "debt," as that word was intended by the writers of the Texas Constitution, no state agency could enter into a reverse repurchase agreement without violating art. 3, § 49 of the Texas Constitution. Since the University is a state agency, it is bound by this prohibition. *Fazekas v. University of Houston*, 565 S.W.2d 299

1. For brevity's sake, we will refer to the agreements between Bache and the University only as repurchase agreements, but our decision with regard to the repurchase agreements applies to all of the transactions entered between the two parties.

(Tex.Civ.App.–Houston [1st Dist.] 1978, writ ref'd n.r.e.) appeal dismissed, 440 U.S. 952, 99 S.Ct. 1487, 59 L.Ed.2d 765; *University of Texas v. Booker,* 282 S.W.2d 740 (Tex.Civ.App.–Texarkana 1955, no writ); Tex.Educ. Code Ann. §§ 65.33, 76.04, 87.-003, 111.31–.32, 112.32, 112.35, 113.33.

In short, if a repurchase agreement creates a debt, as appellee argues and the trial court found, the Board of Regents could not legally authorize Brogden and Harwell to enter into such agreements, because the Board itself legally could not have entered into them.

Art. 3, § 49 states:

*No debt shall be created by or on behalf of the State,* except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or paying existing debt; and the debt created to supply deficiencies in the revenue, shall never exceed in the aggregate at any one time two hundred thousand dollars. (emphasis added.)

The section was enacted when Texas was besieged by tremendous debts inherited from the Republic of Texas, which incurred them during the "revolutionary struggle with Mexico." To prevent the newly formed State from burdening the people, as the Republic had, the writers of the Constitution insisted on the above prohibition against debt, which bar has remained in the Constitution. Thomas, Interpretative Commentary on the Texas Constitution, Tex. Const. art. III, § 49.

With this historical background in mind, and realizing how harsh an effect the $200,-000 limit would have on State growth, the courts have interpreted the provision narrowly. As will be seen from the cases discussed, the word "debt" in this provision has acquired a technical meaning.

The case most frequently cited on the subject is *Texas National Guard Armory Board v. McCraw,* 132 Tex. 613, 126 S.W.2d 627 (1939). That suit was instituted against the Texas Attorney General by the Texas National Guard Armory Board to compel the Attorney General to approve a $4,500,-000 bond issuance by the Board. The Texas

Supreme Court issued the order, concluding that no debt would be created by the bonds since they would not require future citizens of the State to undergo increased taxes to meet the interest payments, and since the armory buildings to be built with the funds would generate enough revenue to pay off all expenses of the project, including bond interest and retirement.

A similar result was reached in *King v. Sheppard,* 157 S.W.2d 682 (Tex.Civ.App.–Austin 1941, writ ref'd w.o.m.). A taxpayer sued the State Comptroller, claiming that the $1,500,000 appropriated by the Legislature to pay for Big Bend National Park created a debt. The court held that the appropriation did not create a debt because the Legislature expected more than $1,500,-000 in total revenues for the year. If funds sufficient to retire the bonds were expected from current revenues, the court declared, no debt would be created. *Id.* This decision was reached despite the presence at that time of a $27 million deficit in the State's General Revenue Fund.

The reasoning behind the above cases has been consistently followed whenever a transaction of the State has been brought into question. In each instance, the transaction was found to be valid when current revenues or revenues generated by the transaction were sufficient to cover the "debt". *See, Lower Colorado River Authority v. McCraw,* 125 Tex. 268, 83 S.W.2d 629 (1935); *Charles Scribner's Sons v. Marrs,* 114 Tex. 11, 262 S.W. 722 (Tex.1924); *Brazos River Conservation and Reclamation District v. McCraw,* 126 Tex. 506, 91 S.W.2d 665 (1936); Tex.Atty.Gen.Op. No. V–1067 (1950).

Thus, the question to be decided here is whether the transaction created revenues from which the expenses could be paid. If it did, no debt was created. To decide this, however, we must examine the nature of the agreements involved.

A repurchase agreement is a method by which an investor uses government securities to alleviate short-term cash demands or to take advantage of favorable market con-

ditions. The investor delivers his securities to a financial institution which pays a discounted value for the securities; simultaneously, the investor agrees to repurchase the securities from the financial institution on a set future date.[2] Most of the agreements involved in this case required the University to repurchase the securities at the same price at which they were sold. During the time between the beginning of the agreement and the maturity or due date of the agreement, the investor pays interest on the funds received from the financial institution. On the other side of the agreement, the financial institution funnels all interest and principal earned by the government securities to the investor. If the securities held by the financial institution decline in value, more securities must be furnished by the investor to the institution to secure the money given by the financial institution. The completion of the agreement occurs on the due date when the investor repurchases the securities.

Generally, a repurchase agreement, although much like a pledge or loan, is fully secured by the securities which are "sold." In one sense, the investor simply exchanges one asset, securities, for another, cash. The interest cost of the cash can be charged against new interest revenues earned by new securities bought with the cash or charged against the interest earnings of all the securities held by the university. Repurchase of the securities can be accomplished by selling the new securities bought with the cash, by selling other securities, or by taking the cash out of the funds it had been invested in and using the cash originally given. In essence, then, current revenues can be used to pay off the debt because the transaction generates its own revenues. Or.Atty.Gen.Op. No. 7725 (1979).

As discussed in *Texas National Guard Armory Board, supra,* and *King v. Shep-*

*pard, supra,* all that is needed to avoid characterization as a debt is an expectation that the obligation will be or can be paid with current revenues or revenues created by transaction. Here, there was more than a mere expectation, since the University obtained in the transaction the very cash with which it could repurchase the securities.

■ Based upon the above reasoning, we conclude that the repurchase agreements in question did not create a debt within the meaning of art. III, section 49 of the Texas Constitution. Accordingly, we sustain appellant's point of error nineteen.

## IS A REPURCHASE AGREEMENT INVOLVING GOVERNMENT SECURITIES AN INVESTMENT IN GOVERNMENT SECURITIES PURSUANT TO § 51.051 OF THE EDUCATION CODE?

The second major question of the case is whether repurchase agreements in government securities, issued by agencies such as the Federal National Mortgage Association and the Government National Mortgage Association, are investments in government securities, pursuant to § 51.051 of the Education Code.

■ The governing boards of the institutions of higher learning are given investment powers by the Education Code, but these powers are limited to investments in "government securities." Tex.Rev.Civ.Stat. Ann. art. 6252–5a § 1 (Vernon Supp. 1980–81) is the governing provision. It states that,

[a]ll boards and agencies of the State of Texas having the power to direct investment of their funds are authorized to invest and reinvest any of their funds in ... obligations the principal and interest of which are guaranteed by the United States of America, indirect obligations of or participation certificates guaranteed

---

**2.** The designation of the agreement as a reverse repurchase or a repurchase agreement depends on the position of the party in the agreement. For example, in the above situation in which an investor has sold securities to a financial institution with an agreement to repurchase them on a future date, the agreement is called a repurchase agreement by the investor and a reverse repurchase agreement by the financial institution. If, on the other hand, the parties were switched, and the investor initially bought securities rather than sold them, the designation of the transaction by the two parties also would be switched.

by the *Federal Intermediate Credit Bank, Federal Land Banks, Federal National Mortgage Association* (FNMA), *Federal Home Loan Banks and Banks for Cooperatives* . . . (Emphasis added.)

The power to "invest and reinvest" logically encompasses both the power to invest in securities and to sell any securities already owned, reinvesting the funds in other securities, or using them to meet current cash demands. This is exactly what occurs in a repurchase agreement, except that there is also an agreement to buy back the securities at a certain future date. Since a repurchase agreement is primarily an investment tool encompassing both an agreement to sell and an agreement to repurchase in the future, rather than simply one or the other, it is consonant with the very general plenary investment powers given to the University. *See* 44 Ops.Cal.Atty.Gen. 140 (1964), in which the California Attorney General concluded that a repurchase agreement is nothing more than a purchase and sale of securities, and consequently, any State investing agency having the authority to purchase and sell securities would also be endowed with authority to enter into repurchase agreements. We conclude that a repurchase agreement is a reacquisition of an original investment agreement and is, therefore, an investment agreement involving government securities. Tex.Rev.Civ. Stat.Ann. art. 6252–5a (Vernon Supp. 1980–1981); Tex.Educ.Code Ann. §§ 51.051, 111.-36, and 111.37 (Vernon 1972).

The trial court also listed as one of its findings of fact that the securities were not deposited with the Texas State Treasurer or the Texas Comptroller of Public Accounts, and that the State Treasurer did not designate a bank or Federal Reserve Bank in which the securities could be deposited. To the contrary, the section is phrased in permissive language, indicating that securities, "at the direction of the state Treasurer, or by an agency directly investing its funds, may be deposited with a bank or federal reserve bank or branch . . ." Because art. 6252–5a is permissive, rather than mandatory, it cannot be used to defeat Bache's claim.

In point of error seventeen, Bache asserts that the source of the funds used to finance the securities need not be proven in order for it to recover. We agree with this contention. If the University claims that an illegal source of funding was used, it shoulders the burden of proving the illegal source plus the reason for its illegality. It did neither of these. No proof was presented at trial and no argument presented on appeal to prove that an illegal source of funding was used. Several legal sources were available, among them income from University land and mineral leases, Tex. Educ.Code Ann. § 111.37 (Vernon 1972), and funds from the transactions themselves. Unless otherwise shown, we may assume that legal sources are used.

## WERE THE TWO EMPLOYEES REPRESENTING APPELLEE IN THESE TRANSACTIONS PROPERLY AUTHORIZED TO ACT FOR APPELLEE?

Having determined that the University was and is, as a matter of law, empowered to invest in repurchase agreements, our next consideration is two-fold: a) Did the Board of Regents have the authority to empower the two employees to act for it? b) If so, was the Board's authority to invest effectively delegated to the two employees in question?

The pertinent statutory provisions are found in the Tex.Educ.Code Ann. §§ 111 et seq., which concerns the University of Houston. The Legislature accomplished two things in this section of the Code: (1) it gave the University of Houston Board of Regents plenary powers to successfully manage the University; and (2) it gave the Board plenary powers to delegate the details of management to a President and other officers.

Tex.Educ.Code Ann. § 111.20 (Vernon Supp. 1981–1982) sets out the specifics of the University of Houston School System. "The governance, control, jurisdiction, organization and management" of the system is vested in the Board of Regents. *Id.* Furthermore, the Board is required by § 111.35 to enact by-laws, rules, and regula-

tions necessary for the successful management and government of the University. Section 111.35 was interpreted by this court in *Fazekas v. Univ. of Houston,* 565 S.W.2d 299 (Tex.Civ.App.–Houston [1st Dist.] 1978, writ ref'd n.r.e.), appeal dismissed 440 U.S. 952, 99 S.Ct. 1487, 59 L.Ed.2d 765, to mean that the rules enacted by the University have the same force as enactments of the Legislature. These two sections constitute a straight-forward grant to the Board of plenary powers to manage the University and to take whatever acts it deems necessary to assure the system's successful management.

The delegatory powers are as broad as the managerial powers discussed above. Section 111.18 requires the Board to appoint a President to be the "executive officer for the board," who will recommend the organization of the University and be "responsible to the Board for the general management and success of the University." Tex.Educ. Code Ann. § 111.18 (Vernon 1972). The board is also to "fix the respective salaries and duties of the officers and employees," Tex.Educ.Code Ann. § 111.19 (Vernon 1972). By enacting the above mentioned sections, the Legislature obviously contemplated that the Board could not run a large University without a great deal of aid from individuals intimately familiar with the details of the University on a day to day basis. The Board has been given the authority to delegate the actual running of the University and to select people qualified to do so, and has been authorized to retain power of approval, power to hire, and power to fire, should the employees not perform adequately. § 111.18.

█ In short, no restrictions of consequence have been placed on the Board's delegatory and managerial powers. Moreover, we conclude that the Legislature's grant to the Board of Regents of complete power to manage the University included the authority to delegate investment duties to employees hired by the Board.

Despite the broad grant of powers to the Board, we might be forced to reach a different conclusion were there evidence that the Board of Regents abstained from all investment decisions, ignoring its responsibility to have the ultimate say in management decisions. It is apparent, however, from the evidence presented at trial, that the Board left only the everyday management of the investment funds to those employees it hired as specialists in the field. It retained the authority to change the program, periodically received reports on the investments program from its financial advisers, and was generally kept abreast of the status of the University's investments.

We hold that the University had the authority to delegate daily investment decisions to subordinates chosen specifically for that purpose and that it did not overstep its authority by doing so.

The next question of concern is whether the investment powers were successfully delegated to Brogden and Harwell. Appellee claims, and the trial court found, that the resolution sent to appellant in March of 1976 did not give either of the two employees the authority to trade in securities. Appellant asserts that the resolution gave Brogden the authority to enter into repurchase agreements and that Brogden in turn delegated his authority to Harwell by the letter accompanying the resolution. Neither of the parties is totally correct in its claim; nor was the court correct in its finding.

Appellant asserts that there is no evidence to support the court's finding that Harwell and Brogden were not authorized to act. When a "no evidence" contention is made, the reviewer on appeal must consider only the evidence tending to support the finding in the light most favorable to the finding of the trial court. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981); *Butler v. Hanson,* 455 S.W.2d 942 (Tex.1970). The resolution effective Sept. 1, 1973, and as reissued in 1976, supports the finding, because it gave authority to sell only to Brogden, with no such authority given to Harwell. Neither of the resolutions authorized the purchase of securities. There is, then, some evidence to support the finding. However, the appar-

ent intent of the resolutions, i.e. that the two named men had authority only to sell, becomes meaningless, in the wake of the mountain of evidence indicating that the men had authority to sell and purchase securities.

The resolution was effective September 1, 1973. Thereafter, MacLean, Brogden and Harwell acted as if they had more authority than simply to sell securities, and they received no protests from the Board. The evidence indicative of their authority to act includes the following:

(1) A memo from Brogden to MacLean dated March 1974 indicating that Brogden was convinced that the short-term investments would improve with Harwell handling them.

(2) A May 1974 memo from MacLean to Brogden setting out the internal controls to be followed while Harwell invested for the University. The controls included the requirement that the financial institutions Harwell dealt with must send confirmations of the transactions to Brogden. Also, MacLean noted that the Office of Internal Auditing would do periodic audits of the financial analyst's work.

(3) A memo from Harwell to Brogden dated December 1974 listing the firms with which Harwell was transacting business for the University. The firms listed were First City National Bank of Houston, Texas Commerce Bank of Houston, Cullen Center Bank of Houston, United California Bank of Houston, and Salomon Brothers.

(4) Memos dated May 1975 and June 1975 concern a report of the short-term investments for the Finance Committee of the Board of Regents. The first memo is the report itself, the second is the minutes of the Finance Committee meeting. The report to the committee, which was presented by Brogden, stated that " . . . investment decisions originate from the financial analyst's office." The report also set out the internal controls devised to safeguard the investment program. Some of the controls listed were that a written record would be kept of all investments and that the records would be forwarded to the Controller's of-

fice, that the office of Internal Auditing would periodically audit the work of the financial analyst, and that the financial transactions would be entered into only with banks of financial institutions approved by the Assistant Vice President and Treasurer.

(5) A summary of Brogden's position, dated August 1975 including his job duties, which it should be remembered, are required by statute to be set by the Board of Regents. Tex.Educ.Code Ann. § 111.19 (Vernon 1972). Listed as duties of Brogden were the recommendation and development of a financial and business management policy for the operation of the University, the supervision of major auxiliary enterprises, the analyzation and management of the investment portfolio, including the buying and selling of revenue bonds and other financial instruments, and reviewing and approving contracts.

(6) The yearly financial report for the fiscal year ending August 31, 1976, dated December 1976. The report was prefaced by two cover letters—one from MacLean and one from the State Auditor who prepared the report. Directed to the University of Houston Board of Regents and to Dolph Briscoe, Governor of Texas, the Auditor's letter admonished the University for not initiating better coordination between the financial analyst and the controller's office in the recording of temporary investment transactions.

(7) A September 16, 1976 memo from Brogden to Harwell discussing a meeting of MacLean's staff which considered ways to continue maximizing income from temporary investments.

(8) A paper on short-term investments control, dated November 1976, which was given MacLean by the Controller of the University which discussed, among other things, the problems arising from the "purchase and/or sale" of securities and reverse repurchase agreements.

(9) A letter from the State Auditor's office, dated December 1976, warning MacLean about the lax accounting procedures fol-

lowed by the financial analyst in recording the purchase and sale of securities.

(10) The cover letter for the 1977 state audit of the University of Houston, dated August 1977, noting the continued lack of coordination between the offices of the Financial Analyst and the Controller in the recordation of temporary investment transactions causing difficulties in the record of interest account.

(11) The Minutes from a September 1977 meeting of the Board of Regents, indicating in item six that MacLean told the Board that the University had had "an active program of short-term investments" for four to five years and that it was time to formally give the financial analyst the authority to act on behalf of the University. This objective was accomplished by a resolution that repeated the same language used in the May 1973 resolution, except that Harwell's name was added and Brogden's was deleted.

(12) An interoffice memo from the Supervising Internal Auditor to the Assistant Vice Chancellor, dated October 1977, discussing the repurchase agreements made by the financial analyst and otherwise outlining in detail the temporary investments system.

(13) A letter from the State Auditor to MacLean, dated November 2, 1977, suggesting improvements to make in the temporary investments program, which was being carried out by Harwell. The letter referred specifically to repurchase agreements.

(14) A request, dated November 22, 1977, from the Supervising Internal Auditor of the University to Capital National Bank asking the Bank to verify that the University had certain repurchase agreements outstanding.

(15) A memo, dated November 22, 1977, from MacLean to Harwell instructing Harwell to cease all trading activity, the first evidence of any such order.

(16) Letters, dated November 22, 1977, from MacLean, as Vice Chancellor, Financial & Management Services, to the banks in the Houston area informing them that Harwell was no longer authorized to trade on behalf of the University. From that point on, only MacLean or the Controller was authorized to make trades.

(17) A letter, dated November 23, 1977, from the Supervising Internal Auditor Department of Internal Audits, requesting a confirmation from Bache that listed repurchase agreements were entered into, plus a request for the amount of interest due Bache.

■ In summary, there is no evidence in the statement of facts, other than the resolution of September 1, 1973, to show that MacLean, Brogden and Harwell lacked authority to trade in securities—i.e., to purchase and to sell—with Bache or any other brokerage firm. The resolution is the lone indication, amid a host of contrary indications, that Brogden and MacLean had authority only to sell securities.

The Board apparently misinterpreted its own resolution because the evidence indicates that Harwell and Brogden either had implied or apparent authority to buy and sell through November 1977, that the University, through the Board of Regents, ratified their transactions through November 1977, or that the University is estopped, by its own actions, from claiming that Harwell and Brogden had no authority to act.

■■ It is a well-settled principle of law that ratification may occur when a principal, though he originally had no knowledge of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge. *Land Title Company of Dallas, Inc. v. F. M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980); *Retama Manor Nursing Centers, Inc. v. Cole,* 582 S.W.2d 196, 201 (Tex.Civ.App.—Corpus Christi 1979, no writ). Consequently, even if Brogden and Harwell were not expressly authorized by the 1973 Board of Directors resolution, their acts could have been ratified by the Board. *Id.* Moreover, to have effectively ratified the agents' acts, the Board would not have had to act formally.

A corporation, like an individual, is bound by the acts of its agents, expressly or

impliedly authorized by it. It may become bound by a ratification without any formal action for that purpose by its board of directors. It may ratify by passive acquiescence, with knowledge, proven or which should be inferred, if continued for a considerable time, will operate as a ratification.

*Almar-York Co. v. Fort Worth National Bank,* 374 S.W.2d 940, 942 (Tex.Civ.App.– Fort Worth 1964, writ ref'd n.r.e.).

■ There is a great deal of evidence indicating that the Board knew that Brogden and Harwell were buying and selling securities. To begin with, Brogden's job summary, as of 1975, included the purchase and sale of financial instruments as part of his duties. There are also several indications that the Board of Regents knew of Brogden's and Harwell's activities: the June 1975 report to the Finance Committee of the Board explaining the investment program to be managed by the financial analyst, and the yearly financial report for 1976 prepared by the State Auditor, briefly discussing, among other things, the lax procedures followed by the financial analyst's office in the recordation of purchases and sales of securities.

*Retama Manor Nursing Centers, Inc., supra,* provides an excellent example of a situation in which a Board of Directors was estopped by its own actions from claiming that its agent did not have authority to act. Retama, a nursing home, and its parent, Geriatrics, were exploring the possibility of expanding a nursing home owned by Retama. For this purpose, Asmus, the president of both Retama and Geriatrics, and a member of the Board of Directors of Retama, employed an architect by the name of Dassler to prepare plans and specifications for the expansion project. In connection with the job, Dassler flew to Alice, Texas, the location of the nursing home, to consult with the contractor, Cole. Although Dassler and Cole reached an agreement concerning a major portion of the job, Cole knew that any agreement would have to be approved by Asmus in Colorado. Dassler apparently conferred with Asmus and told Cole to initiate the necessary preparation to begin construction within a month's time.

The court found that Asmus' authority could be inferred from the circumstances surrounding the contracts and that the silence of the Board of Directors and its acquiescence in the transactions which preceded and followed the contracts were sufficient evidence of apparent authority. The court proceeded to delineate the actions taken by Asmus that would estop the Board from denying Asmus' authority to act, and his authority in turn to hire Dassler to act for the corporation: Asmus hired Dassler; he authorized Dassler to spend a week in Corpus Christi negotiating with Cole for a construction contract; he authorized Dassler to tell Cole that the contract price was acceptable; and later authorized Dassler to call Cole and tell him that he had a contract. Not once during this period did the Board of Directors make an effort to stop the activities, but sat by and accepted the benefits of Cole's knowledge in preparing the plans and preparing the site for construction. *Id.* at 198, 201.

In a like manner, the University of Houston Board of Regents made no effort to repudiate the actions of Brogden and Harwell. The following are actions taken by the Board, as well as information received by it, which indicate its knowledge of the mens' actions: 1) the creation of a new position to accommodate Harwell's activities, and which included extensive trading with financial institutions; 2) reports to the Board of Regents; 3) in-house meetings of the financial division at which financial problems, including investments, were discussed; and 4) letters from the State Auditor and the Controller of the University discussing lax accounting procedures surrounding the University's securities in general, and the repurchase agreements, in particular.

We conclude that there is ample evidence to prove ratification by the Board of Regents or to estop the Board from claiming that Brogden and Harwell did not have the authority to act.

The University asserts that theories of ratification, estoppel, or implied authority, do not help Bache, pointing out that agents and employees of the State of Texas have only such authority as is specifically granted them by law. No actions of their own, outside their scope of employment, can be used to bind the State. Three cases cited in support of this contention are *State v. Ragland Clinic-Hospital,* 138 Tex. 393, 159 S.W.2d 105 (1942); *State v. Steck Co.,* 236 S.W.2d 866 (Tex.Civ.App.–Austin 1951, writ ref'd), and *State v. Perlstein,* 79 S.W.2d 143 (Tex.Civ.App.-Austin 1934, writ dism'd). These cases, as well as the line of reasoning they support, are inapplicable here, since they involved express statutes which were violated by agents of the state. *Ragland Clinic-Hospital* involved a suit by the Clinic against the State for medical care given to a prisoner brought in by a liquor control board agent. The agent told the hospital, when he brought the prisoner in, that the State would pay for the services given. The agent had no authority to bind the State because a statute required all such decisions to be made by county officers, not liquor control board agents, and the court held that the State could not be bound by an agent acting beyond his express statutory authority. Likewise, in *Steck, supra,* the Chief of the Cigarette Tax Stamp Board privately contracted with Steck to print an additional 100,000 stamps, in contravention of a statute requiring that all contracts be let out for bids.

The reasoning behind these cases is that one dealing with a state employee is on notice of the employee's limited statutory authority to act for the State and should ascertain the extent of the employee's authority by referring to the governing statute.

■ In the present case we are not confronted by an employee who has surpassed his express statutory authority given by the legislature. We are dealing with an agent whose employer has statutory authority to do what was done. In the cases cited by the University, a statute established the limits of the agent's authority and, since the statute placed authority elsewhere, or required certain procedures to be followed which were not followed, the agents did not have, and could never have, the authority to do what they did. However, we do not have that situation here. We are confronted with a question of agency between an employer and an employee, not a question of an *ultra vires* act.

■ In summary, there is but a scintilla of evidence—the 1973 Board of Regents resolution—indicating that McLean, Brogden and Harwell were not authorized to purchase and sell securities on behalf of the University. We conclude that McLean, Brogden, and Harwell, as a matter of law, were authorized to act on behalf of the University. *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898); *National Life and Accident Insurance Co. v. Shern,* 389 S.W.2d 726 (Tex.Civ.App.–Austin 1965, no writ).

Having decided that Harwell and Brogden could enter into investment contracts for the University, it is important to note at this point that the University is as responsible for the fulfillment of agreements as any individual would be, *Board of Regents, University of Texas v. S. & G. Construction Co.,* 529 S.W.2d 90 (Tex.Civ.App.–Austin 1975, no writ).

■ The rule is well settled that if the State is engaged in enacting or enforcing laws, or in discharging other governmental functions, it is to be regarded as a sovereign; but when it becomes a suitor in its own courts, or a party to a contract with a citizen, it is to be regarded as an individual, with the same law applying to it as applies under like conditions to the contracts of an individual. *See, Fristoe v. Blum,* 92 Tex. 76, 45 S.W. 998 (1898); *State v. Cloudt,* 84 S.W. 415 (Tex.Civ.App.–1904, writ ref'd.); *State v. Elliott,* 212 S.W. 695 (Tex.Civ. App.–Galveston 1919, writ ref'd); *Marrs, supra.*

In *Fristoe,* supra, the Supreme Court had the following to say concerning the State's obligations with regard to contracts.

As there is a perfect contract, the State is bound to perform it according to its legal

tenor and effect, and to redeem the pledge it has declared to be irrevocable. In entering into the contract, it laid aside its attributes as a sovereign, and bound itself, substantially, as one of its citizens does when he enters into a contract. Its contracts are interpreted as the contracts of individuals are, and the law which measures individual rights and responsibilities measures, with few exceptions, those of a state, whenever it enters into an ordinary business contract. *Id.* 45 S.W. at 999.

*Fort Worth National Bank v. State,* 158 S.W.2d 885 (Tex.Civ.App.1942, writ ref. w.o. m.); *Harris v. O'Connor,* 185 S.W.2d 993 (Tex.Civ.App.–El Paso 1944, err. ref. w.o. m.); *Stacy v. Bridge City Independent School District,* 357 S.W.2d 618 (Tex.Civ. App.–Beaumont 1962, no writ); *Board of Regents, University of Texas,* supra; *Seaway Co. v. Attorney General,* 375 S.W.2d 923 (Tex.Civ.App.–Houston 1964, writ ref'd n.r.e.) opinion by Chief Justice Bell. Appellant's points of error one, two, six, eight, nine, eleven and thirteen are sustained.

## DID THE TRIAL COURT ERR IN NOT ALLOWING THE TRIAL AMENDMENT OF BACHE?

█ In its 25th point of error, Bache claims that the trial court committed error in not allowing its trial amendment. Because of the earlier decision in this opinion that the transactions entered into between appellee and appellant were not violative of any state statute, we need not rule on the point. The trial amendment was an attempt by appellant to increase its relief prayed for under a theory of unjust enrichment, should the transactions be found void. Having found that the transactions were valid, there is no need to address the point of error since any error committed was harmless.

Our decision has also rendered pointless any discussion of appellant's twenty-seventh point of error by which appellant claims the take-nothing judgment violative of the United States and Texas constitutional prohibitions against taking without just compensation and impairment of contracts.

Appellant urges the court to render judgment that it recover $581,781.39 against appellee plus statutory attorney's fees, or a larger amount under the unjust enrichment theory. Appellee understandably asks that the judgment of the trial court be affirmed.

To recapitulate our decisions on the five questions we set forth at the outset of our opinion, we have concluded the following: 1) the repurchase agreements did not violate the debt prohibition in art. III, § 49 of the Texas Constitution; 2) all of the transactions were investments in government securities; 3) the University, through its Board of Regents, was authorized to invest in securities, was authorized to delegate this authority to employees of the University, and, as a matter of law, either ratified the actions of MacLean, Brogden, and Harwell, or is estopped from claiming that the men did not have authority to act for the University; 4) no harmful error was committed by the trial court's refusal to allow Bache's trial amendment; and 5) because the trial court made no finding in favor of the appellant that will support an assessment of damages, we must remand the case to the trial court for a finding on the matter of damages and attorneys fees.[3] A contract was entered into by the parties, and because the appellee breached that contract, it must reimburse the appellant for damages incurred by it as a result of the breach.

Accordingly, the case is reversed and remanded to the trial court to decide such damages as may be shown by the appellant for the transactions handled by Brogden and Harwell between January 1976 and late November 1977 and the amount of attorneys fees to be awarded to the appellant.

---

**3.** Obviously, we have not discussed some of the points of error raised by Bache, but this was only because a discussion of them was rendered moot by the above conclusions.